**UNITED STATES of America**

v.

**Stephen FLEMMI**

**No. CR 94–10287–MLW.**

United States District Court,
D. Massachusetts.

Aug. 30, 2001.

Kenneth J. Fishman, Fishman, Ankner & Horstman, LLP, Boston, MA, Kimberly Homan, Boston, MA, for Stephen J. Flemmi.

Martin G. Weinberg, Oteri, Weinberg & Lawson, Boston, MA, for John V. Martorano.

A. Hugh Scott, Choate, Hall & Stewart, Boston, MA, for James A. Ring.

Jonathan M. Albano, Thomas J. Hennessey, Bingham, Dana & Gould, Boston, MA, for Globe Newspaper Co., Shelley Murphy, Kevin Cullen.

Paul W. Hodes, William E. Christie, Shaheen & Gordon, PA, Concord, NH, for John L. McIntyre.

John Cavicchi, Boston, MA, pro se.

John M. Thompson, Thompson & Thompson, P.C., Springfield, MA, Michael A. Fitzpatrick, Bridgeport, CT, for Louis Pugliano.

Joel J. Berner, Dept. of Correction Legal Dept., Boston, MA, for Michael T. Maloney.

Richard E. Briansky, Bernkopf, Goodman & Baseman, LLP, Boston, MA, for Homecomings Financia.

Michael W. Carroll, Schectman & Halperin, Providence, RI, for Household Finance Co.

Charles A. Perkins, Perkins & Associates, P.C., N. Chelmsford, MA, for Wellington Condominium Trust.

James M. Hughes, Devin & Drohan, Hingham, MA, for South Shore Savings Bank, Inc.

Fred M. Wyshak, Jr., Brian T. Kelly, James D. Herbert, John Durham, Richard L. Hoffman, U.S. Attorney's office, Boston, MA, for U.S.

---

1. Pursuant to Federal Rule of Criminal Procedure 11(e)(1)(C) the court must either accept the plea agreement and impose the sentence on which the parties have agreed or reject the plea agreement and give the defendant the opportunity to withdraw his plea. *See,* Fed. R.Crim.P. 11(e)(3) and (4); U.S.S.G. § 6B1.3.

2. *See, United States v. Escobar Noble,* 653 F.2d 34, 36 (1st Cir.1981).

## MEMORANDUM AND ORDER

WOLF, District Judge.

The following is an edited version of the transcript of the decisions and remarks made by the court at the August 21, 2001 sentencing of Stephen Flemmi. Citations have been added.

*   *   *   *   *   *

For the reasons I will explain, I hereby accept the parties' Federal Rule of Criminal Procedure 11(e)(1)(C) binding plea agreement.[1]

█ The plea agreement involves the dismissal of certain charges, including the RICO and RICO conspiracy charges in the Fourth Superseding Indictment that allege defendant Stephen Flemmi committed numerous racketeering acts, including murder. The plea agreement requires that the court impose a particular sentence. When dismissal of charges and a resulting lower sentence are involved, the court may reject the plea agreement if it is not reasonable and necessary to secure a legitimate and important prosecutorial interest or to serve another compelling interest.[2] Generally, the court must decide if the agreed sentence is in the public interest.[3]

█ The agreement in this case is the result of arms' length negotiation between experienced counsel.[4] I find that it is necessary to serve an important prosecutorial interest. It clears the way for Flemmi to be prosecuted on the RICO murder charges pending before Judge Richard Stearns.[5] That prosecution could have

---

3. *See, United States v. Carrigan,* 778 F.2d 1454, 1461–64 (10th Cir.1985); *United States v. Miller,* 722 F.2d 562, 563 (9th Cir.1983); *see also, United States v. Carrozza,* 807 F.Supp. 156, 158 (D.Mass.1992).

4. *See, United States v. C.R. Bard,* 848 F.Supp. 287, 288 (D.Mass.1994).

5. *United States v. Stephen Flemmi,* Cr. No. 99–10371–RGS.

been delayed a very long time if this case, the case before Judge Joseph Tauro, and the case before Judge Robert Keeton had to be tried first and perhaps appealed.[6] The government has also explained that it is contemplated that Judge Stearns' case will be resolved before trials proceed in Oklahoma and Florida on murder charges against Flemmi.[7]

Moreover, as I wrote in 1999, the RICO and RICO conspiracy charges in the Fourth Superseding Indictment which will be dismissed are fundamentally flawed. They are premised on the theory that Flemmi and James "Whitey" Bulger were conspiring with members of La Cosa Nostra (the "LCN" or "Mafia") during a long period when they were Federal Bureau of Investigation ("FBI") Top Echelon informants against the Mafia. Despite repeated requests, the FBI refused to inform the United States Attorney whether Bulger or Flemmi was an informant until the day before the original indictment was returned.[8] Then the United States Attorney, Donald Stern, did not tell the prosecutors in this case that they were informants for six months.[9]

The original RICO and conspiracy charges would have been very difficult, if not impossible, to prove. Flemmi has substantial defenses relating to whether he was authorized to engage in the conduct alleged to be criminal in the case before me.[10] For example, before the charges were brought, an FBI review conducted by John Michael Callahan concluded that Flemmi was "at least tacitly authorized" to participate in "LCN policy-making." [11]

██ There are also substantial related questions regarding whether the conspiracies and RICO enterprise alleged existed.[12] If the RICO enterprise were not proven, the racketeering acts, including those involving murders in the 1960s, would not be federal offenses.[13] As I wrote in 1999:

> All of these issues [ ] present serious impediments to the successful prosecution of this case. If the United States Attorney and other officials of the Department of Justice had been properly informed before the proposed indictment

---

6. The binding plea agreement provides for a guilty plea by Flemmi in the case before Judge Tauro (Cr. No. 99–10428–JLT), the imposition by Judge Tauro of a sentence of 41 months incarceration to be served concurrently with the 120 months to be imposed in this case, and the dismissal of the case before Judge Keeton (Cr. No. 97–10060–REK).

7. The investigations of the 1982 murders of Roger Wheeler and John Callahan were impeded by some members of the FBI in an effort to protect Bulger and Flemmi. *See, United States v. Salemme,* 91 F.Supp.2d 141, 154, 208–13 (D.Mass.1999) *rev'd in part on other grounds, sub. nom. United States v. Flemmi,* 225 F.3d 78 (1st Cir.2000). Flemmi and Bulger's former co-defendant in this case, John Martorano, is now cooperating with the government and has admitted committing those murders. J. Weaver, "3 named in 1982 mob hit," *The Miami Herald,* Mar. 15, 2001, at 1; B. Braun, N. Marshall, "Wheeler mur-

der charges are filed," *Tulsa World,* Mar. 15, 2001, at 1. Flemmi and Bulger have now been charged with those crimes as well. *Id.*

8. ·*See, Salemme,* 91 F.Supp.2d at 158–160, 294–95, 298–301.

9. *Id.* at 301.

10. *Id.* at 159–60, 316–17; *see also, United States v. Salemme,* 978 F.Supp. 343, 346–47, 353–54 (D.Mass.1997).

11. *Salemme,* 91 F.Supp.2d at 159, 298–300.

12. *Id.* at 159–60, 316–17.

13. Murder in aid of racketeering did not become a federal crime until the enactment of 18 U.S.C. § 1959 in 1984. The federal RICO statute, 18 U.S.C. § 1961 *et seq.,* under which murder may be prosecuted as a racketeering act, was enacted in 1970.

of Bulger and Flemmi was presented to the grand jury, perhaps Bulger and Flemmi would not have been charged at all, or different, more narrow charges might have been fashioned in an effort to reduce the risk that their indictment would prove to be fatally flawed. It is inconceivable to this court, however, that the case against Flemmi and Bulger as indicted in January, 1995 would have been brought by any reasonable prosecutor who was properly informed of their relationship with the FBI.[14]

The plea agreement allows the government to salvage something from this long and costly case, which involved arduous efforts by the Massachusetts State Police, the Internal Revenue Service, and others, including the prosecutors.

There are six extortion and one money laundering conspiracy counts in the Superceding Information. The charges to which Flemmi has pled guilty include the simplest charges against him that were in the original indictment in this case, the individual extortions. They are the charges on which the government would have had the best chance of prevailing at trial, although success on those charges was not certain in view of Flemmi's meaningful authorization defense.

The government represented at the change of plea colloquy[15] and reiterated today that there is no relevant conduct to be included in calculating the Guideline range for Flemmi's sentence. Therefore, the agreed sentence for the charges in the Superseding Information is within the Guideline range. Accordingly, it is reasonable for the remaining charges. Moreover, if I erred in giving Flemmi a three-point reduction for acceptance of responsibility and his Offense Level is 32 and not 31, the sentence that has been agreed

upon to is only a one-month departure. That would be reasonable in the circumstances of this case.

As a result of the plea agreement, members of Flemmi's family will have the government's claims against certain property released. The problems with proving the case before me evidently would have created complications concerning the money laundering conspiracy charges in Judge Keeton's case and the forfeiture counts in this case as well. This plea agreement assures that the government recovers about $2,000,000. In the totality of the circumstances, the approximately $1,500,000 that is released to Flemmi's family does not render the plea agreement unreasonable. Among other things, private litigants with claims against Flemmi are already making claims concerning those funds.

Therefore, I accept the binding plea agreement and impose the agreed-upon sentence as follows. In connection with the seven counts to which he pled guilty, I hereby sentence Stephen Flemmi to serve 120 months in the custody of the Attorney General of the United States, concurrent on each count. I am not imposing a fine because the parties have agreed, in effect, that Flemmi cannot pay a fine, even in installments. There is a $400 special assessment. In addition, I am ordering as part of Flemmi's sentence forfeiture as ordered in the Preliminary Order of Forfeiture.

I am not imposing any term of supervised release because none is provided for in the binding plea agreement. To the extent that is a departure, it is a reasonable departure. Supervised release is included in the plea agreement in the case before Judge Tauro. There is also the

---

**14.** *Salemme,* 91 F.Supp.2d at 160.

**15.** May 16, 2001 Tr. at 6.

prospect, because of the pending charges, that Flemmi will be detained for a long time.

In view of the acceptance of the binding plea agreement, I am dismissing the Fourth Superseding Indictment with prejudice. I do retain jurisdiction regarding forfeiture and enforcement of Orders that I have entered previously.

It is customary at this point for the court to address the defendant. There is a great deal that I could, and ordinarily would, say to and about Flemmi. However, that is not going to be the focus of my remarks.

Flemmi thanked me. I think it is odd to thank someone for just doing his job. That is all I have done in this case.

There are murder charges pending against Flemmi. Therefore, I choose not to comment on his conduct. However, by not talking about Flemmi, I do not mean to excuse or minimize the seriousness of any of the crimes to which he pled guilty or any of the crimes that he may have committed.

Future trials will determine if Flemmi is proven to be a murderer. However, I will say this today, to some extent reiterating and amplifying what I have written before.

If Flemmi has committed any of the crimes with which he remains charged, he was able to do so largely because of the protection of the Federal Bureau of Investigation.[16] It is clear to me that by the early 1970s Flemmi would have either

been killed or in prison like Frank Salemme if FBI Special Agent Paul Rico had not, in 1969, tipped Flemmi off and encouraged him to flee just before he was indicted for the bombing of John Fitzgerald and the murder of Walter Bennett.[17]

All of the murders with which Flemmi is charged in the pending cases against him occurred after he was told by Rico in 1974 to return to Boston and, as promised, the charges against him were dismissed.[18] The first of the murders Flemmi is alleged to have committed in the case before Judge Stearns occurred in October, 1974, just months after Flemmi returned.[19]

As I wrote in my September, 1999 decision, if Flemmi had been prosecuted in 1969 for the Fitzgerald bombing or the William Bennett murder, his role as an FBI informant might have been disclosed and examined more than 30 years ago.[20] Rico prevented that from happening.

As I also wrote in 1999, Rico's partner, Dennis Condon, was the main mentor for both FBI Special Agents John Morris and John Connolly.[21] It was Connolly, assisted by Condon, who forged the partnership between Bulger and Flemmi that has been the focus of this case for many years.[22]

The evidence in this and other reported cases indicates that the FBI's relationship with Bulger and Flemmi was not an isolated, aberrant occurrence attributable to Bulger and Connolly's shared South Boston roots. Rather, while hopefully extreme in degree, it may have been typical

**16.** *Salemme,* 91 F.Supp.2d at 151, 163, 177, 187, 242–43, 321.

**17.** *Id.* at 151, 182, 184.

**18.** *Id.* at 151, 185.

**19.** *See United States v. Stephen Flemmi, et al.,* Cr. No. 99–10371–RGS, Count 1, Racketeering Act 6.

**20.** *Salemme,* 91 F.Supp.2d at 182.

**21.** *Id.* at 184–85.

**22.** *Id.* at 186–88.

of the relationship that the FBI had with a number of its Top Echelon informants.

As I found based on convincing evidence in this case, Sonny Mercurio received similar protection from the FBI and was allowed to flee his indictment in 1989.[23] As described in footnote 6 of my decision, I also received convincing evidence that another FBI informant, not handled by any of the agents who testified in this case, was told by his FBI handler about investigations concerning him, including wiretaps on his telephone.[24] I provided that information to Attorney General Reno.[25] I do not know what, if anything, was done with it. Similarly, in 1997, United States District Judge Jack Weinstein of the Eastern District of New York found that an FBI supervisor had improperly provided law enforcement information to a Top Echelon informant in the midst of an LCN war for control of the Colombo family.[26]

I doubt that Judge Weinstein and I have discovered the only instances of such abuse. Rather, I expect much more misconduct has been masked by the secrecy in which the FBI has operated its confidential informants and the deference it has demanded and almost always received from the Department of Justice.[27]

I also do not view this case as a problem of what the prosecutors have at times re-

---

23. *Id.* at 156 n. 6, 263–64, 268–69, 288–93.

24. *Id.* at 156 n. 6.

25. *Id.*

26. As I wrote in 1999:

> [T]here are striking similarities between the relationship Flemmi and Bulger had with their FBI handlers and the relationship that Top Echelon informant Gregory Scarpa, Sr. had with his FBI handler, Supervisory Special Agent R. Lindley Delvecchio, which is depicted in *Orena v. United States*, 956 F.Supp. 1071, 1085–90, 1101–04 (E.D.N.Y. 1997). In *Orena*, it was found to be "likely" that "Delvecchio ... 'paid' Scarpa by passing along information, creating a two-way street for communications that was dangerous and unauthorized." *Id.* at 1087, 1090. For example, the evidence indicated that Delvecchio protected Scarpa by alerting him to investigations, advising him of electronic surveillance, identifying individuals cooperating with law enforcement, and warning him of imminent arrests. *Id.* at 1071, 1085–90, 1101–04.

*Id.*

27. The institutionalized ethos of deference to the FBI concerning the confidentiality of its informants was exemplified by the evidence in this case concerning the 1984–85 electronic surveillance targeting Bulger and Flemmi in which judges were falsely told that the FBI was investigating possible violations of Title 18 of the United States Code by Bulger and Flemmi. *Id.* at 177–70, 220–42, 351–81. James Greenleaf, the Special Agent in Charge of the Boston Office initially declined a request from United States Attorney William F. Weld to participate in the investigation of Bulger and Flemmi being led by the Drug Enforcement Administration ("DEA"). *Id.* at 223–25.

> Weld told [DEA Special Agent in Charge Robert] Stutman of Greenleaf's response. Weld May 26, 1998 Tr. at 46. They discussed the possibility that Bulger and Flemmi were FBI sources. Stutman Apr. 14, 1998 Tr. at 71–72. Neither Weld nor Stutman, however, ever asked Greenleaf if either or both were informants, and Greenleaf did not tell them. Stutman Apr. 14, 1998 Tr. at 73; Weld May 26, 1998 Tr. at 133; Greenleaf Jan. 8, 1998 Tr. at 195. Rather, Weld and Stutman simply accepted the fact that the FBI would not identify its informants, even to trusted colleagues in the Department of Justice with a legitimate need to know. Stutman did not ask Greenleaf if Bulger and Flemmi were FBI informants because Stutman knew that, "it would have required [Greenleaf] either lying about it or saying 'I can't tell you.'" Stutman Apr. 14, 1998 Tr. at 73. Similarly, Weld never asked the FBI to identify an informant because, if he did, he "would have expected [the FBI] to tell [him] to go pound sand." Weld May 26, 1998 Tr. at 133.

ferred to as a few "bad apples." The evidence in this case has persuaded me, as I wrote in my 1999 decision, that more than a dozen officials of the FBI in Boston and in Washington engaged in various forms of misconduct to protect Flemmi and Bulger.[28] Those officials included Larry Potts, who later became the Acting Deputy Director of the FBI.[29] As I understand it, Mr. Potts ultimately resigned because of controversy concerning misconduct involving the FBI's investigation of the events at Ruby Ridge that cost Marshal Bill Degan of Boston his life.[30]

The reported comments of two United States Senators at the confirmation hearings of Robert Mueller, the new Director of the FBI, had particular resonance for me. Senator Arlen Specter said, "I believe there is a culture of concealment in the FBI." [31] Senator Charles Grassley said, "The FBI is suffering from a management culture so arrogant that ignoring the rules and covering up is the order of the day." [32]

I do not know the context of those remarks, or the particular events that the Senators had in mind. However, I would say that this case tends to validate those general views.

The evidence in this case has demonstrated a long pattern of the FBI: ignoring the government's Constitutional and statutory duties to be candid with the courts in seeking warrants for electronic surveillance, among other things; [33] refusing to be candid with prosecutors, like Gary Crossen and Diane Kottmyer, who had to represent the government in discharging those duties; [34] and ignoring directions from the Attorney General of the United States by refusing to obey the Guidelines concerning confidential informants issued by Attorneys General Edward Levi and Benjamin Civelletti, among other things.[35]

Contrary to the suggestions of some, the evidence in this case indicates that this culture is enduring and exists today. Once again, as I wrote in my September, 1999 decision, beginning in 1997, I issued general orders that had the effect of requiring the production of FBI documents memorializing Brian Halloran's claim that Bulger and Flemmi were responsible for the murder of Roger Wheeler.[36] When found by

*Id.* at 225.

**28.** *Id.* at 156–58 and referenced sections of that Memorandum and Order describing improper actions to protect Flemmi and Bulger by Special Agents in Charge of the Boston Office of the FBI, Assistant Special Agents in Charge, Special Agents, and a Chief of the Organized Crime Section at FBI headquarters.

**29.** *Id.* at 157, 251–252.

**30.** May 21, 1998 Tr. at 10; P. Nealon, "Ex FBI official tells of keeping Bulger on," *The Boston Globe*, May 22, 1998, at B5; R. Ostrow and R. Jackson, "FBI Officials Avoid Charges in Ruby Ridge Case," *Los Angeles Times*, Aug. 16, 1997, at A1.

**31.** W. Washington, "Mueller blames poor oversight for FBI woes," *The Boston Globe*, July 31, 2001, at A4.

**32.** *Id.*

**33.** *Salemme,* 91 F.Supp.2d at 150–51 and n. 1, 167–72, 220–42, 269–89, 351–53, 369–80.

**34.** *Id.* at 150 n. 1, 221–22, 233–36, 270, 274–86, 351–53, 372–74.

**35.** *Id.* at 174, 196–97. As I have also written previously, however, "Neither the government nor the FBI is a monolith." *Salemme,* 978 F.Supp. at 351 n. 2. The evidence in this case demonstrated that "agents of the FBI in Boston were not uniform in their conduct concerning Bulger and Flemmi." *Salemme,* 91 F.Supp.2d at 158 n. 8 and referenced sections of that Memorandum and Order identifying FBI agents in Boston whose efforts to investigate Flemmi and Bulger were frustrated by their colleagues.

**36.** *Id.* at 154 n. 3, 212–13.

Special Agent Stanley Moody, those documents were given to Barry Mawn, the Special Agent in Charge of the FBI in Boston, to review because, Moody said in an affidavit, they contained information that "was obviously highly singular and sensitive." [37] They were not, however, produced in discovery in this case in time for the key witnesses, Rico and Morris, to be questioned about them.[38] Rather, they were belatedly disclosed after repeated inquiries by the court.[39] Similarly, important FBI documents concerning John McIntyre were also improperly withheld by agents of the Boston FBI until it was too late to question relevant witnesses concerning them.[40]

However, despite my published judicial findings of misconduct, Mawn has been promoted to Assistant Director of the Federal Bureau of Investigation.[41] This contributes to my sharing the concerns expressed by Senators Grassley and Specter, and to sensing that this case is a symptom of a culture in the FBI which has a long history and which endures.

**37.** *Id.*

**38.** *Id.*

**39.** *Id.* As I wrote in 1999:

[I]n 1982 and 1983, FBI reports containing allegations against an individual were to be indexed by that individual's name and placed in an investigative file. *See* Moody Aff., Apr. 29, 1998, ¶ 5. With one exception, however, the many reports containing Halloran's charges against Bulger and Flemmi were not properly indexed with a reference to their names. *Id.* at ¶ 5–6; Apr. 17, 1998 Tr. at 8, Apr. 24, 1998 Tr. at 20–21, Apr. 30, 1998 Tr. at 4–10. Thus, these documents were not found or considered by the Department of Justice officials who were assigned, in July 1997, as a result of this case to review allegations that had been made by informants and witnesses against Bulger and Flemmi. *See* Chase Aff., Apr. 29, 1998. Nor, when found by the Boston office of the FBI, were the documents promptly produced to the defendants as required by this Court's June 26, 1997 Order and other rulings. June 26, 1997 Order, ¶ 4(c); Moody Aff., Apr. 29, 1998; May 5, 1998 Tr. at 2–12 (Lobby, Under Seal). If the documents had been produced in a timely manner, Rico and Morris could have been questioned about them. None of the documents, however, were provided to the defendants at the time Rico testified in January 1998. In addition, some documents relating to Halloran's charges against Flemmi and Bulger that should have been produced in connection with Morris' appearance were not disclosed until his lengthy testimony was complete. However, Special Agent Moody, who had found the Halloran documents, had provided them long before to Boston ASAC Mike Wolf and SAC Barry Mawn to review because the information that they contained "was obviously highly singular and sensitive." Moody Aff., Apr. 29, 1998, ¶ 7, Aff. of Special Agent Stanley Moody, May 5, 1998 ("Moody Aff., May 5, 1998"), ¶ 2; May. 1, 1998 Tr. at 3–8.

Both Flemmi and the government had reasons to hope that Halloran's allegations against Flemmi and Bulger would not be fully exposed or resolved in this case. From Flemmi's perspective, a thorough exploration of the Halloran charges might prove that he participated in murder. From the FBI's perspective, exposure of its agents' conduct had the foreseeable potential to reveal an extraordinary effort to protect Bulger and Flemmi that involved serious impropriety, if not illegality. In any event, neither Morris nor Rico was recalled as a witness.

As a result of the delayed disclosure of the Halloran documents by the government and of the failure of the adversary system to operate fully and effectively on this issue, questions remain regarding the role, if any, played by Flemmi and Bulger in the Wheeler, Halloran, and Callahan murders, and the full degree to which the FBI in Boston has, from 1981 until recently, attempted to keep any such role from being discerned and demonstrated.

*Id.* at 212–13.

**40.** *Id.* at 154 n. 3, 213–14.

**41.** J. Rakowsky, "Boston FBI Chief Tapped to Head N.Y. Office," *The Boston Globe*, Apr. 1, 2000, at B7.

This case has taken a long time, more than six years. It undoubtedly would have gone faster if the prosecutors had persuaded me in eight hearings conducted during two months in 1997 not to order the disclosure that Bulger was a confidential informant.[42] It also would have gone faster if the prosecutors' repeated efforts to persuade me not to grant evidentiary hearings had succeeded.[43]

After this long time, it is natural to wonder whether anything has been accomplished by the arduous effort that this case represents. I have thought about this question a great deal.

I think some things of value have been achieved. I understand that it has been important for Mrs. Emily McIntyre to find out more, although not everything, about what happened to her son John. As it was explained to me at a hearing in June, 2000, Mrs. McIntyre lived in Nazi Germany during World War II. At the end of the war, she worked for the Justices at the Nuremberg War Crimes trials. She married an American citizen, and moved to the United States so her son could grow up in a democracy.[44] Now, fifteen years after he disappeared, she at least knows that her son is no longer alive.[45]

Similarly, reportedly largely as a result of this case, Joseph Salvati and others have been vindicated in their claim that they were not fairly convicted and sentenced to death for murdering Teddy Deegan because agents of the FBI covered up evidence indicating that their informants had killed Deegan and had testified falsely about the murder.[46] I give a great deal of credit for this to an attorney I have never encountered personally, John Cavicchi, who began writing to me persistently in June, 2000, about my findings concerning the Deegan murder. I also give credit to another man I have not met, Victor Garo, who represented Mr. Salvati for many years.

I believe these discoveries are real accomplishments. I am, however, skeptical about whether anything of institutional importance has been achieved by this case.

I know that Attorney General Reno issued new informant Guidelines to address virtually all of the problems presented by this case.[47] However, that effort reportedly began after Bulger was revealed to be an informant in 1997.[48] The new Guidelines were not issued until just before the Attorney General left office in January, 2001. I do not know if there is now a serious effort to implement those Guide-

---

**42.** *Salemme,* 978 F.Supp. at 345.

**43.** *Id.* at 344–64; *United States v. Salemme,* 1997 WL 810057, at *1–3 (D.Mass. Dec. 29, 1997).

**44.** June 28, 2000 Tr. at 24–25.

**45.** In January, 2000, Kevin Weeks, a codefendant of Flemmi and Bulger's in the case before Judge Stearns who is now cooperating with the government, reportedly led investigators to a mass grave containing three bodies; one was John McIntrye. *See* S. Murphy, "Victims Kin Sue Gangsters, Agents Press Investigators on Bulger Search," *The Boston Globe,* Mar. 9, 2001, at B8.

**46.** *See, Commonwealth v. Peter Limone,* 420 Mass. 499, 650 N.E.2d 782 (1995); C. Goldberg, "An Innocent Man Goes Free 33 Years After Conviction," *The New York Times,* Feb. 2, 2001, at A12; *see also Salemme,* 91 F.Supp.2d at 180.

**47.** *See, Department of Justice Guidelines Regarding the Use of Confidential Informants* (2001), http://www.usdoj.gov:80/ag/reading-room/ciguidelines.htm; *see also* S. Murphy and R. Ranalli, "US tightens rules on informants," *The Boston Globe,* Jan. 9, 2001 at 1.

**48.** M. Zuckoff, "Bulger case sparks probe in U.S. House," *The Boston Globe,* Jul. 24, 1998, at A1.

lines by the current administration of the Department of Justice.[49] I also do not know whether implementing the Guidelines will only cause FBI agents dealing with Top Echelon-type informants not to document their work. This case demonstrated that much relating to Flemmi was not documented by the FBI for many years, and he was operated as an informant even when he was closed on the books of the FBI.[50]

Moreover, I am not aware of any Congressional Committee examining whether the Guidelines are being implemented.[51]

What I do know is that the Attorney General for whom I worked, Edward Levi, issued his informant Guidelines in December, 1976, one month before he left office.[52] Mr. Stern and Assistant United States Attorney James Herbert at various times have acknowledged that, if obeyed, those Guidelines would have prevented the abuses revealed in this case.[53] However, as I

found, there was overwhelming evidence that they were routinely disregarded with respect to Flemmi, Bulger, and other Top Echelon informants.[54]

Moreover, I know that Attorney General Levi was an assistant to Attorney General Francis Biddle, who tried to curb misconduct by J. Edgar Hoover's FBI in the 1940s.[55] Yet that did not spare Attorney General Levi from having to contend with widespread abuses by the FBI that had recurred in the 1960s and 1970s.[56]

I have long recognized that, as Justice Louis D. Brandeis wrote, "Sunshine is said to be the best of disinfectants."[57] However, I doubt that in this case that alone is enough.

Nevertheless, I do believe there is intrinsic value in the struggle to give integrity to the ideal of justice under law. Many people have contributed significantly to that effort in this case.

**49.** For example, § I.I of Attorney General Reno's Guidelines require that within 120 days of January 8, 2001 the FBI and other Department of Justice investigative agencies "develop agency-specific guidelines that comply with these Guidelines, and submit such agency-specific to the [Assistant Attorney General] for the Criminal Division for review." The court is not aware of any published report or other information indicating that the FBI has complied with this directive.

**50.** *Salemme,* 91 F.Supp.2d at 154 n. 3, 199, 211, 218.

**51.** The House of Representatives Committee on Government Reform is investigating the FBI's conduct in securing the convictions of Mr. Salvati and others for the Deegan murder. *See, e.q.,* J.M. Lawrence, "Salvati ready to tell Congress about frame-up," *Boston Herald,* May 2, 2001, at 2; S. Murphy, "No apology from agent in Salvati case," *The Boston Globe,* May 4, 2001, at A1.

**52.** *Salemme,* 91 F.Supp.2d at 190.

**53.** *Id.* at 174, 197.

**54.** *Id.* at 174, 196, 210, 219, 226, 252, 268–69.

**55.** *See, e.g.,* Francis Biddle, *In Brief Authority,* 166–67, 297 (1962). In balance, Attorney General Biddle's public appraisal of Hoover in 1962 was positive. *Id.* at 261. However, he then wrote:

A more disturbing question is the future use of this great machine of detection [the FBI] with its ten million personal files, its reputation grown sacrosanct—human agencies should court criticism rather than wear halos—its obvious possibilities of misusing the trust it has won. When Hoover resigns or retires or dies, what will happen—can the same freedom be given to another man, the virtual freedom from control? I do not believe it can.
*Id.*

**56.** *Salemme,* 91 F.Supp.2d at 188–90; *see also,* John Elliff, *The Reform of FBI Intelligence Operations,* (1979).

**57.** Louis D. Brandeis, *Other People's Money* 92 (1914).

I would like to thank the Court Security Officers, who have been with me, for their support and encouragement. I would like to thank the Marshals for their professionalism and sensitivity to issues that have arisen.

I would also like to commend my staff. I wrote every word of the 661 page decision I issued in 1999. However, my secretary, Margaret Priestley, typed every word, often many times. My heroic court reporter, Judith Twomey, has performed under pressure to produce a prodigious number of important transcripts.

I have also had a succession of law clerks. They only stay for one year. None of them could have a panoramic view of this case. I am reluctant to single out any one of them because they have all contributed significantly. However, Dan Weintraub, who was here during the hearings in 1998, has come back today. He had many assignments concerning this case. Among other things, every day he made a list of what I had ordered the parties to do, including a list of what I had ordered the government to produce. Day after day, month after month, at the bottom of the list, unaddressed, were the issues of the Brian Halloran documents and then the John McIntyre documents. But for Dan's meticulous attention to detail at a tumultuous time, perhaps those Halloran documents would still be in Mawn's desk.

I would also like to commend Kenneth Fishman for his highly professional representation of Flemmi. He took Flemmi as a paying client in 1995. Since 1997, he has continued to represent Flemmi as Criminal Justice Act counsel at sharply reduced rates of remuneration.[58] This consuming case has undoubtedly injured his practice and had an adverse financial effect on his family. Yet his dedication to his client and to the adversary system of justice has not wavered.

In representing Flemmi, Mr. Fishman has extended a great tradition in this country. In 1770, a young patriot trying to develop a fledgling law practice took a case that no other attorney would accept. John Adams agreed to represent the English soldiers accused of murder in what came to be known as the Boston Massacre. He knew it would be unpopular.[59] However, as he said in opening his successful defense of almost all of his clients: "I am for the prisoners at the bar and shall apologize for it only in the words of the Marquis Beccaria. 'If by supporting the rights of mankind, and of invincible truth, I shall contribute to save from the agonies of death one unfortunate victim of tyranny, or ignorance, equally fatal, his blessing and years of transport shall be sufficient consolation to me for the contempt of all mankind.' "[60]

The difficulty that this United States District Court had for about nine months in finding another attorney to represent Flemmi in the case before Judge Stearns demonstrates that we cannot take the tradition represented by John Adams and Mr. Fishman for granted.[61] I am encouraged,

**58.** *See United States v. Salemme*, 985 F.Supp. 197 (D.Mass.1997); Nov. 14, 1997 Order.

**59.** David McCullough, *John Adams*, 65–68 (2001).

**60.** *Id.* at 67; *see also* Marvin Wolfgang, "Introduction" to Cesare Beccaria, *Of Crimes and Punishments*, ii (Marsilo Publishers 1996).

**61.** J.M. Lawrence, "No Bullets—Top legal guns balk at representing 'Rifleman'," *Boston Herald*, Apr. 18, 2001, at 1; J.M. Lawrence, " 'Rifleman' Flemmi's defenders ask for money," *Boston Herald*, Jun. 8, 2001, at 5; "Attorney Appointed for Jailed Flemmi," *The Boston Globe*, Jul. 12, 2001.

however, to have recently received from Mr. Fishman an application to join our Criminal Justice Act panel in order to take regular CJA appointments in the future. Apparently, this case has strengthened rather than diminished his commitment to the adversary system of justice.

Finally, I would like to commend the people of this community who have taken an interest in this case. My sense is that they naturally recognize what this case is most fundamentally about. They have a deep concern and admirable common sense about what is truly significant rather than merely sensational.

As I have written before, when Attorney General Harlan Fiske Stone established the FBI in 1924, he warned that, "There is always the possibility that a secret police may become a menace to free government and free institutions because it carries with it the possibility of abuses of power which are not quickly. apprehended or understood." [62] That risk is greatly magnified if people are indifferent to abuses of power or, indeed, hostile to the exposure of those abuses.

In 1949, Judith Coplon, an employee of the Internal Security Section of the Department of Justice, was convicted in New York of providing stolen documents to the Soviet Union. She was arrested by the FBI while delivering some of those documents to a Soviet spy. There was no question about her guilt. However, she had been arrested without a judicial warrant. In addition, on grounds of national security, she had been denied access to documents that may have demonstrated that all of the evidence against her was derived from illegal wiretaps. [63]

Despite the pervasive popular fear of the Soviet Union, a unanimous Court of Appeals for the Second Circuit reversed Coplon's conviction, primarily because the trial court had not required the FBI to disclose how it had obtained the evidence against her. In explaining that decision, one of the most distinguished judges in our nation's history, Learned Hand, wrote that, "A society which has come to wince at [the] exposure of the methods by which it seeks to impose its will upon its members has already lost the feel of freedom . . ." [64]

I believe, and am impressed, that the people of this community have not lost their feel of freedom. Rather, they understand the wisdom of Justice Felix Frankfurter's observation that, "It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." [65]

I have found many things about this case to be profoundly disturbing and dispiriting. However, the reaction of the people of this community gives me hope.

My role in this case has essentially ended. I trust, however, that the dedication of the public to demanding law enforcement that is fair as well as effective, even when dealing with the most dangerous crimes and criminals, will endure.

---

62. *Salemme,* 91 F.Supp.2d at 173, 189; Alpheus Thomas Mason, *Harlan Fiske Stone: Pillar of the Law,* 153 (1956) (quoting *N.Y. Times,* May 10, 1924).

63. *See, United States v. Coplon,* 185 F.2d 629 (2d Cir.1950); *see also* Gerald Gunther, *Learned Hand* 592–98 (1994).

64. *Coplon,* 185 F.2d at 638.

65. *United States v. Rabinowitz,* 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting).