Stephen M. RAKES, Gary W. Cruickshank, as Trustee in Bankruptcy of Stephen M. Rakes, Nichole Rakes, Meredith Rakes, Colby Rakes, and Stippo's, Incorporated, Plaintiffs,

v.

UNITED STATES of America, John J. Connolly, Jr., John M. Morris, James J. ("Whitey") Bulger, Stephen J. ("The Rifleman") Flemmi, Kevin Weeks, John Does, Nos. 1–50, United States Department of Justice, and Federal Bureau of Investigation, Defendants.

Julie Rakes Dammers, Plaintiff,

v.

United States of America, John J. Connolly, Jr., and John M. Morris, Defendants.

No. CIV.A.02–10480–WGY, CIV.A.02–10867–WGY.

United States District Court, D. Massachusetts.

Jan. 3, 2005.

---

**2.** The Homeland Security Act of 2002 placed the provision in (b)(7). It was later changed to (b)(8). *See* Pub.L. 108–21, § 508(b).

Thomas J. Butters, Butters, Brazilian & Small, Boston, MA, for Kevin P. O'Neil, Defendant.

Brian P Fitzsimmons, Hanley, Hassett & Fitzsimmons, LLC, Quincy, MA, for James Ahearn, Defendant.

Andrew D. Kaplan, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for USA, Defendant.

Paul V. Kelly, Kelly, Libby & Hoopes, PC, Boston, MA, for Stippo's, Inc., Colby Rakes, Meredith Rakes, Nichole Rakes, Stephen M. Rakes, Plaintiffs.

Margaret Krawiec, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for USA, Defendant.

Edward J. Lonergan, Boston, MA, for John J. Connolly, Jr., Defendant.

Joseph F. McDowell, III, McDowell & Osburn, P.A., Manchester, NH, for Julie Rakes Dammers, Movant.

E. Peter Mullane, Mullane, Michel & McInnes, Cambridge, MA, for John J. Connolly, Jr., Defendant.

Megan E. Perrotta, Butters, Brazilian & Small, LLP, Boston, MA, for Kevin P. O'Neil, Defendant.

Christine M. Roach, Roach & Carpenter, P.C., Boston, MA, for James Greenleaf, Defendant.

Alan D. Rose, Jr., Rose & Associates, Boston, MA, for James Ring, Defendant.

Alan D. Rose, Sr, Rose & Associates, Boston, MA, for James Ring, Defendant.

### MEMORANDUM AND ORDER

YOUNG, Chief Judge.

This case consolidates two separate suits, essentially alleging the same misconduct. Julie Rakes Dammers ("Dammers"), her former husband Stephen Rakes ("Rakes"), and other members of the Rakes family brought suits against the

Lisa M. Asiaf, Kelly, Libby & Hoopes, P.C., Boston, MA, for Stippo's, Inc., Colby Rakes, Meredith Rakes, Nichole Rakes, Stephen M. Rakes, Gary W. Cruickshank, Plaintiffs.

Stacey Bosshardt, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for USA, Defendant.

Richard E. Bowman, Rose & Associates, Boston, MA, for James Ring, Defendant.

William A. Brown, Boston, MA, for Robert Fitzpatrick, Defendant.

United States of America (the "United States"), the Federal Bureau of Investigation (the "Bureau"), Federal Bureau of Investigation agents John J. Connolly, Jr. ("Connolly") and John M. Morris ("Morris"), and others. Dammers and the Rakes family claim that Bureau agents cultivated special relationships with members of the criminal organization known as the "Winter Hill Gang" (the "Gang") for use as informants. While nurturing their relationships with informants James J. "Whitey" Bulger ("Bulger") and Stephen J. "The Rifleman" Flemmi ("Flemmi"), in particular, the plaintiffs argue that the United States and its agents protected Bulger and Flemmi from investigation, arrest, and prosecution, and leaked confidential law enforcement information to Bulger. The plaintiffs contend that these acts, allegedly carried out in contravention of Bureau rules and regulations regarding the proper handling of informants, emboldened Bulger and Flemmi to commit criminal acts and led to the Gang's 1984 extortion of Rakes and Dammers's liquor store and the threats made against the Rakes family.

Dammers and the Rakes family have put forth, inter alia, various claims under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b), 2671–80, including theft and conversion, intentional torts, negligence, intentional and negligent infliction of emotional distress, loss of parental and spousal consortium, and loss of prospective business relationships. The United States has moved for summary judgment on the plaintiffs' FTCA claims [Doc. No. 195], and the plaintiffs have opposed the motion [Doc. No. 236] ("Pls.' Opp'n").[1] The United States has also filed a renewed motion

to dismiss the FTCA claims as time-barred under the FTCA's two-year statute of limitations, 28 U.S.C. § 2401(b). [Doc. No. 179]. The United States contends that Rakes and Dammers's FTCA claims accrued before the cut-off date of May 11, 1999. Rakes and Dammers separately oppose the renewed motion to dismiss, arguing that their claims accrued on September 15, 1999, the day Judge Wolf issued his opinion in *United States v. Salemme*, 91 F.Supp.2d 141 (D.Mass.1999) [Doc. No. 234]; [Dammers Doc. No. 164]. On November 16, 2004, this Court heard oral arguments on both of the United States' motions. After careful reflection, the Court now addresses each motion in turn.

## I. UNITED STATES' MOTION FOR SUMMARY JUDGMENT ON RAKES AND DAMMERS'S FTCA CLAIMS

The following facts do not appear to be in dispute for purposes of this motion for summary judgment. Bulger and Flemmi were members of the Winter Hill Gang, a criminal organization engaged in activities including murder and extortion. Pls.' Opp'n at 2.[2] From 1967 to 1990, Bulger and Flemmi also acted as FBI informants, providing valuable information on La Cosa Nostra. *Id.* at 3. They were handled by FBI Special Agent John Connolly and Supervisory Special Agent John Morris, the supervisor in charge of the Organized Crime Squad of the Boston Office of the FBI. *Id.* At the time Connolly officially opened Bulger as an informant in September 1975, Bulger had a criminal background. Def.'s Mem. [Doc. No. 196] at 3. Likewise, at the time Connolly officially re-

---

1.  Unless otherwise noted, all docket numbers refer to filings in the Rakes docket.

2.  Many of the facts cited in the plaintiffs' opposition are taken from admissions made by the government in its Response to Plain-

tiffs' First Request for Admissions, dated June 14, 2004. Other facts are taken from admissions that Court has deemed the government to have made in its Order, dated October, 21, 2004.

opened Flemmi as an informant in September 1980, Flemmi had a criminal background and was suspected of being involved in murder. *Id.* During their years as confidential informants for the FBI, Bulger and Flemmi were involved in numerous murders, as described in *United States v. Salemme,* 91 F.Supp.2d 141, and *United States v. Flemmi,* 195 F.Supp.2d 243 (D.Mass.2001) (Wolf, J.). Def.'s Mem. at 3.

Prior to May 1982, Connolly and Morris met socially with Bulger and Flemmi. *Id.* They also received gifts from Bulger and Flemmi between 1976 and 1994. *Id.* In 1976, for instance, Connolly improperly accepted a diamond ring from Bulger and Flemmi. *Id.* Bulger and Flemmi gave Morris a case of wine in late 1981 or early 1982, $1,000 in spring 1982 and again in late 1982 or early 1983, and $5,000 in 1986 or 1987. *Id.*

Plaintiffs Rakes and Dammers opened a liquor store in South Boston in December 1983. *Id.* at 2. Within approximately two weeks of opening, Bulger, Flemmi, and defendant Kevin Weeks ("Weeks") extorted the store from Rakes and Dammers in exchange for $67,000 and promises of more money. *See id.* Dammers contacted her uncle, Boston Police Detective Joseph Lundbohm ("Lundbohm"), for help, and he said that he would call a friend at the FBI for her. *Id.* Lundbohm contacted Connolly regarding the extortion, and Connolly responded that unless Rakes and Dammers were willing to wear a wire during their meetings with Bulger, the FBI was unlikely to intervene. *Id.* at 2–3. Connolly never documented his conversation with Lundbohm or investigated Rakes and Dammers's allegations of extortion. *Id.* at 3. Instead, Connolly informed Bulger of his conversation with Lundbohm. *Id.* In late 1994 or early 1995, Connolly leaked to Bulger and Flemmi that they had been indicted for murder. *Id.* at 3–4. This tip

allowed Bulger to flee and to evade arrest to this day. *Id.* at 4.

Based on the foregoing facts, the United States argues that it should be granted summary judgment on the plaintiffs' FTCA claims because (1) Connolly and Morris's conduct was outside the scope of their employment, Def.'s Mem. at 4; (2) the discretionary function exception bars the plaintiffs' claims, *id.* at 9; and (3) the plaintiffs' claims would fail under Massachusetts tort law, *id.* at 16.

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, no genuine issues of material fact remain. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson,* 477 U.S. at 251, 254, 106 S.Ct. 2505. A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505; *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993). In making its determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.* The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the non-moving party must "go beyond the pleadings, and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial." *Id.* at 323–24, 106 S.Ct. 2548 (inter-

nal quotation marks omitted). Guided by this standard of review, the Court examines each of the United States' arguments for summary judgment.

## A. Scope of Employment

■ The FTCA grants jurisdiction for claims that are "caused by the negligent or wrongful act or omission of any employee of the government, while acting within the scope of his office or employment" under state law. 28 U.S.C. § 1346(b). Under Massachusetts law, conduct is within the scope of employment if (1) "it is of the kind [the agent] is employed to perform;" (2) "it occurs substantially within the authorized time and space limits;" and (3) "it is motivated, at least in part, by a purpose to serve the employer." *Wang Labs., Inc. v. Business Incentives, Inc.,* 398 Mass. 854, 859, 501 N.E.2d 1163 (1986). "The scope of an employee's employment," according to the Supreme Judicial Court, "is not construed restrictively." *Howard v. Town of Burlington,* 399 Mass. 585, 590, 506 N.E.2d 102 (1987).

■ The United States argues that the plaintiffs' FTCA claims fail to satisfy the first prong of the *Wang* test because Connolly and Morris's conduct was not of the kind they were employed to perform: .

> The disclosure of a confidential informant's name to criminals, and protecting them from investigation and prosecution, are not activities of the kind that FBI agents are hired to perform. "The FBI Manual requires agents to exercise constant care to ensure that an informant's identity is not disclosed, whether intentionally or inadvertently." *McIntyre v. United States,* 367 F.3d 38, 54 (1st Cir. 2004) (quoting *United States v. Salemme,* 91 F.Supp.2d 141, 150 (D.Mass. 1999)).... Connolly's release of any informant's name, or other sensitive law enforcement information, to Bulger and Flemmi would have been wholly outside

any authority delegated to him. This conduct does not further the institutional goals of the FBI; it is antithetical to them.

Def.'s Mem. at 5. The United States contends that Connolly and Morris were "engaged in an independent and private purpose of [their] own and not pursuing the business of [their] employer." *Id.* at 6.

Rakes and Dammers argue that the United States' "self-serving conclusion answers the wrong question" because "[t]he issue is not whether Connolly and Morris were authorized to commit their wrongful acts, but instead whether such acts were incidental to their authorized duties." Pls.' Opp'n at 5–6 (citing *Howard,* 399 Mass. at 590, 506 N.E.2d 102 (ruling that "anything which is reasonably regarded as incidental to the work specifically directed" satisfies the first prong of the scope of employment test)); *see also Aversa v. United States,* 99 F.3d 1200, 1212 (1st Cir.1996) (applying New Hampshire's scope of employment test, which is virtually identical to that of Massachusetts, and holding that "[a]lthough an employee's intentionally tortious act was not authorized, it may nonetheless have been within the scope of employment if it was 'incidental to authorized duties'"). Accordingly, Rakes and Dammers argue that "the actions [Connolly and Morris] took to protect Bulger and Flemmi so as to maintain their value as informants were incidental to their authorized duties of handling informants." Pl.'s Opp'n at 6. "[T]he fact that the agents abused their authority by releasing sensitive law enforcement information to Bulger and Flemmi," contend Rakes and Dammers, "does not relieve the government of liability." *Id.* (citing *Aversa,* 99 F.3d at 1212 (holding that a AUSA's conduct, while "tortious and contrary to his employer's policies and rules," was within the scope of his employment)).

Essentially, the United States seems to argue that because Connolly and Morris's conduct was contrary to certain FBI rules and regulations, they must have been acting outside the scope of their employment. This argument has a hollow ring. Were it accepted, any employer who prescribes that "all employees must act with due care in performing their duties" would be shielded from all liability for negligence. This is not the law. Connolly and Morris were hired, at least in part, to handle confidential informants. Soliciting valuable information from Bulger and Flemmi about La Cosa Nostra and guarding their identities as Top Echelon Informants are part of the job. In carrying out their responsibilities as handlers, Connolly and Morris allegedly violated various FBI rules and regulations. These violations by themselves, however, are not enough to support the conclusion that Connolly and Morris's conduct in protecting their valued informants was not incidental to their overall duties as handlers.

The United States next argues that Connolly and Morris's conduct was driven by an "independent and private purpose," Def.'s Mem. at 6, and therefore does not satisfy the third prong of the *Wang* test which requires that the conduct "is motivated, at least in part, by a purpose to serve the employer." *Wang Labs.*, 398 Mass. at 859, 501 N.E.2d 1163. In support of its argument, the United States points to evidence that Connolly and Morris received gifts from Bulger and Flemmi and interacted with them socially. Def.'s Mem. at 3, 8. Under Massachusetts law, "if an employee acts from purely personal motives ... *in no way connected with the employer's interests*," he is not acting within the scope of his employment. *Pinshaw v. Metropolitan Dist. Comm'n*, 402 Mass. 687, 694–95, 524 N.E.2d 1351 (1988)(emphasis added). The United States asserts that "[t]he only individuals who would have benefitted from the egre-

gious misconduct at issue were Bulger, Flemmi, Connolly, and John Morris—not the FBI." Def.'s Mem. at 8. This blanket conclusion is unconvincing. There is some evidence that during their tenure as Top Echelon Informants, Bulger and Flemmi provided the FBI with valuable information regarding La Cosa Nostra in Boston. *See Salemme*, 91 F.Supp.2d at 203 (quoting Connolly as writing "Information from [Flemmi] is currently being utilized in the preparation of an affidavit in support of ... targeting [98 Prince Street], which is the highest priority organized crime investigation in [Washington, D.C.]. In addition to the Angiulo case, this informant is one of the two primary informants who will furnish the majority of probable cause ... targeting [the] (# 2 man in the Boston [La Cosa Nostra] )"); *id.* (quoting Morris as writing "[Bulger] is one of the most highly placed and valuable informants in the Boston Division .... The closing of an informant of this caliber would deal a serious blow to the [Organized Crime Program] of the Boston Division" (emphasis omitted)). Given that Rakes and Dammers have presented some evidence that Connolly and Morris's protection of Bulger and Flemmi aided the FBI's pursuit of La Cosa Nostra, it would be improper for this Court to conclude at the summary judgment stage that Connolly and Morris were acting "from purely personal motives ... in no way connected with the employer's interests." *Pinshaw*, 402 Mass. at 694–95, 524 N.E.2d 1351.

Finally, the United States argues that Rakes and Dammers's claims fail under the third prong of *Wang* because Connolly and Morris's conduct was so egregious that it could not possibly have been motivated by an intent to further their employer's business. Def.'s Mem. at 7 (citing *International Broth. of Police Officers, Local 433 v. Memorial Press*, 31

Mass.App.Ct. 138, 141, 575 N.E.2d 376 (1991) ("[T]he fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business.")). While the degree of outrageousness of an employee's conduct may tend to prove or disprove the extent to which the conduct was motivated by a desire to serve his employer, one could reasonably infer from the evidence in this case that Connolly and Morris's conduct, while deeply disturbing, was not so "outrageous or abnormal," Def.'s Mem. at 7, to fall utterly outside the scope of employment. The cases cited by the United States are factually distinguishable and do not undermine this result. *See id.* at 8–9 (citing *Timpson v. Transamerica Ins. Co.,* 41 Mass.App.Ct. 344, 347–50, 669 N.E.2d 1092 (1996) (rejecting the argument that a football player was acting in the interest of his employer when he sexually harassed a reporter in the team locker room) and *Doe v. Purity Supreme, Inc.,* 422 Mass. 563, 568, 664 N.E.2d 815 (1996) (rejecting the argument that a grocery store manager was acting in the scope of his employer when he raped and sexually assaulted a fellow employee)).

Overall, taking all factual inferences in favor of Rakes and Dammers, the Court rejects the United States' argument that Connolly and Morris's conduct was outside the scope of employment.

## B. The Discretionary Function Exception

The United States contends that Rakes and Dammers's FTCA claims fail because they are based on conduct that falls within the discretionary function exception. Def.'s Mem. at 9. The FTCA bars "[a]ny claim based upon ... the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). To determine whether claims fall within the discretionary function exception to the FTCA, courts must apply a two-step test:

(1) "First, an inquiring court must identify the conduct that allegedly caused the harm" and

(2) "Then, in determining whether Congress sought to shelter that sort of conduct from tort liability, the court must ask two interrelated questions: (1) Is the conduct itself discretionary? (2) If so, does the exercise of discretion involve (or is it susceptible to) policy-related judgments?"

*Muniz–Rivera v. United States,* 326 F.3d 8, 15 (1st Cir.2003).

Before conducting its analysis, the United States frames Rakes and Dammers's claims as being based on "(a) the FBI's employment of informants with criminal histories; (b) the FBI's failure to investigate their extortion; [and] (c) the FBI's failure to protect Plaintiffs from being extorted." Def.'s Mem. at 9 (alterations omitted). This is an unfair characterization of the basis of Rakes and Dammers's FTCA claims. As explained in their opposition memorandum, Rakes and Dammers's "claims are predicated on a series of actions by FBI agents Connolly, Morris and others that violated *mandatory* rules and regulations for their handling of Bulger and Flemmi—rules and regulations that were put in place to avoid the very harm inflicted upon the community of South Boston in general and Plaintiffs in particular." Pls.' Opp'n at 9. In other words, Connolly and Morris's alleged violations of these rules and regulations allegedly caused the harm to Rakes and Dammers. This Court thus undertakes its analysis on Rakes and Dammers's own construction of their FTCA claims, rather

than the United States' self-serving characterization.

In determining whether the discretionary function exception applies, the Court must first identify "the conduct that allegedly caused the harm." *Muniz–Rivera*, 326 F.3d at 15. Rakes and Dammers allege that the conduct that caused their harm "consists of a pattern of intentional and reckless wrongdoing by certain FBI agents, and the failure of their superiors to reasonably supervise them, all in violation of mandatory rules and regulations." Pls.' Opp'n at 10–11. While their case for direct causation would likely be strengthened by making a more straightforward "failure to investigate/failure to protect" argument, Rakes and Dammers choose to make a more attenuated argument that Connolly and Morris's violations of mandatory rules and regulations caused them harm. This strategic move may make their FTCA claims more difficult to prove at trial, but for present purposes, it strengthens their argument that the discretionary function exception does not apply.

Next, the Court must ask "(1) Is the conduct itself discretionary? (2) If so, does the exercise of discretion involve (or is it susceptible to) policy-related judgments?" *Muniz–Rivera*, 326 F.3d at 15. Conduct is discretionary if it "is a matter of choice for the acting employee." *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). "[C]hallenged conduct is not discretionary if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Heinrich ex rel. Heinrich v. Sweet*, 62 F.Supp.2d 282, 324 (D.Mass.1999), *rev'd on other grounds*, 308 F.3d 48 (1st Cir.2002).

Rakes and Dammers argue that "[t]he FBI rules and regulations for handling informants as set forth in the Levi Memorandum, FBI Manual and revised FBI Guidelines [hereinafter "MIOG"], ... left no room for Defendants to exercise choice or judgment relative to undertaking the conduct that caused Plaintiffs' harm." Pls.' Opp'n at 11. Rakes and Dammers give the following examples:

(1) "The handling agent must admonish informants against participation in planning criminal acts or engaging in acts of violence. MIOG § 137–3.4(1)(f) and (g)."

(2) "When an FBI field office learns of the commission of a serious crime by an[ ] informant, FBI headquarters must be notified. MIOG § 137–4(5)(b)."

(3) "When an FBI field office learns of participation by an informant in a serious act of violence, FBI headquarters must be notified. MIOG § 137–4(5)(c)."

(4) "The handling agent must record and index all information furnished by or about informants. MIOG §§ 137–5(7); 137–8(1)."

(5) "An FBI agent responsible for handling an informant does not have the discretion to reveal to that informant the identity of a person reporting a crime committed by that informant. MIOG § 137–5(10)."

*Id.* at 12. A 1997 administrative inquiry by the FBI Office of Professional Responsibility found that FBI supervisors did not follow written review requirements, and an October 1999 Compliance Review found a total of twenty-seven instances of Bulger and Flemmi threatening someone, yet there is no record that FBI headquarters was ever notified of the threats. *Id.*

Again, according to Rakes and Dammers's theory of their claims, the conduct at issue in this case is Connolly and Morris's disregard for various FBI rules and regulations. At least some of the rules and regulations cited by Rakes and Dammers are mandatory in nature. *See, e.g.*, MIOG § 137–4(5)(b) ("Whenever a field office learns of the commission of a serious

crime by an informant or confidential source, even if unconnected with an FBI assignment, FBIHQ *must* be notified." (emphasis added)). In fact, nothing in the United States' brief suggests that these rules and regulations were actually discretionary in any way. Therefore, the conduct complained of—namely, Connolly and Morris's violations of FBI rules and regulations—is not discretionary, and thus not covered by the discretionary function exception to the FTCA.

## C. Duty To Act Under Massachusetts Tort Law

The United States argues that Rakes and Dammers's FTCA claims are "not viable because there is no analogous private person liability under state law." Def.'s Mem. at 16 (alterations omitted). Under the FTCA, liability can only arise under circumstances where "a private person[ ] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). In the instant case, the United States contends that Massachusetts law does not impose a duty on a private person to protect a third party.[3] Def.'s Mem. at 17. Specifically, the United States argues that Massachusetts courts have applied section 314 of the Restatement (Second) of Torts (1965), *see id.* at

18, which provides that "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose a duty to take such action." *Id.* at 18 n. 11. While this is true, as will be discussed in more detail below, Massachusetts appears to recognize some exceptions to the general rule expressed in section 314.[4]

### 1. The Section 321 Exception

The exact issue of Massachusetts law presented here was addressed recently by Judge Lindsay on a motion to dismiss in *Estate of Davis ex rel. Davis v. United States,* 340 F.Supp.2d 79 (D.Mass.2004), a case involving allegations that the FBI wrongfully permitted Bulger and Flemmi to engage in various crimes, including the murder of Debra Davis. Judge Lindsay held that although Massachusetts law does not, in general, impose a duty on a private person to protect a third party from harm, it has "embraced the principle, if not the actual text," of section 321(1) of the Restatement (Second) of Torts (1965), which provides that "[i]f the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." *Davis,* 340 F.Supp.2d at 90. In support,

---

**3.** The United States couches Rakes and Dammers's FTCA claims solely in terms of a negligent *failure* to act. This is too restrictive a reading. Rakes and Dammers have not only alleged that the defendants have made improper omissions, but also that the defendants took *affirmative* steps to shelter and to encourage Bulger and Flemmi in their criminal activities, including extortion. Rakes and Dammers have also made various intentional tort claims which the United States has not addressed here. Accordingly, the Court here only considers the United States' argument in terms of Rakes and Dammers's claim that the FBI negligently failed to act.

**4.** *See generally* Restatement (Second) of Torts § 314 cmt. a (1965) ("The general rule stated in this Section should be read together with other sections which follow. Special relations may exist between the actor and the other, as stated in § 314 A, which impose upon the actor the duty to take affirmative precautions for the aid or protection of the other. The actor may have control of a third person, or of land or chattels, and be under a duty to exercise such control, as stated in §§ 316–320. The actor's prior conduct, whether tortious or innocent, may have created a situation of peril to the other, as a result of which the actor is under a duty to act to prevent harm, as stated in §§ 321 and 322.").

Judge Lindsay cited *Commonwealth v. Levesque*, 436 Mass. 443, 449–50, 766 N.E.2d 50 (2002), a case in which the Supreme Judicial Court noted that "[a]lthough we have yet to recognize explicitly § 321 as a basis for civil negligence, we have expressed agreement with its underlying principle. It is consistent with society's general understanding that certain acts need to be accompanied by some kind of warning by the actor." (citation omitted). The court in *Levesque* held the defendants criminally liable for the deaths of six firefighters who died in a warehouse fire that the defendants had accidentally started, but failed to report or to control. Judge Lindsay reasoned in *Davis* that "[i]f an individual can be criminally liable for failing to mitigate a hazard of his own creation that results in death, it follows that he also can be subject to civil liability in those circumstances." *Davis*, 340 F.Supp.2d at 90.[5]

Rakes and Dammers urge this Court to adopt Judge Lindsay's ruling in *Davis* that Massachusetts law recognizes section 321. While the reasoning in *Davis* is convincing in the context of murder, it is unclear whether the Supreme Judicial Court would impose a duty in the instant case where the only physical harm alleged is emotional distress. Section 321(1) specifies conduct that creates "an unreasonable *risk of causing physical harm*" and provides that a private person may be "under a duty to exercise reasonable care to prevent *the risk from taking effect.*" Ultimately, even if this Court agrees with Judge Lindsay that Massachusetts recognizes the section 321 exception, it is uncertain whether the Supreme Judicial Court would apply it to this particular case.

## 2. The "Special Relationship" Exception

The applicability of section 321 aside, the United States concedes that under Massachusetts law, a duty to act does extend "to those who have relied in some special way upon the defendant, to those whom defendants have helped to place in a position where they are likely to depend upon his avoiding negligent omissions." Def.'s Mem. at 19 (quoting *Carrier v. Riddell, Inc.*, 721 F.2d 867, 868–69 (1st Cir. 1983)) (internal quotations omitted). In *Carrier v. Riddell, Inc.*, a case governed by Massachusetts law, the First Circuit explained when a duty to help arises:

> Speaking in terms of classical tort principle, when one claims that negligence lies in the *commission* of an act, a de-

---

5. In support of their position that a duty of care exists, Rakes and Dammers also cite the Supreme Judicial Court's decision in *Bellows v. Worcester Storage Co.*, 297 Mass. 188, 7 N.E.2d 588 (1937). In that case, a depositor of goods brought a negligence action against a warehouse for the loss of her goods where a third person, while temporarily insane, broke into the warehouse through a damaged door and set the place on fire. The court explained:

> There can be no question that negligence may consist in a failure to guard against the wrongful and even criminal acts of third persons. In *Sojka v. Dlugosz* [, 293 Mass. 419, 200 N.E. 554 (1936) ], recovery was permitted against a father who left a rifle accessible to his thirteen year old son and ought to have foreseen his negligent use of

it. . . . In *Morse v. Homer's, Inc.*[, 295 Mass. 606, 4 N.E.2d 625 (1936) ], a bailee was held liable for failure to guard against a robbery, the likelihood of which ought to have been foreseen.

*Id.* at 195, 7 N.E.2d 588. Rakes and Dammers argue that *Bellows* stands for the proposition that Massachusetts law recognizes a private person's duty to protect others from the foreseeable criminal acts of third persons. *Bellows* does not go that far. The court in *Bellows* recognized from the outset that the warehouse owner had a statutory duty to "'exercise such care in regard to' the plaintiff's goods 'as a reasonably careful owner of similar goods would exercise.'" *Id.* at 195, 7 N.E.2d 588 (quoting Mass. Gen. Laws ch. 105, § 27).

fendant's duty not to behave negligently typically extends to include all those whom the defendant might reasonably have foreseen to be potential victims of the negligence. *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. at 341–43, 162 N.E. 99 ... Restatement (Second) of Torts, § 281. But where negligence consists of an *omission*—a *failure* to act—a defendant's duty not to act negligently is more limited. It extends to those who have relied in some special way upon the defendant, to those whom defendants have helped to place in a position where they are likely to depend upon his avoiding negligent omissions. *See* Restatement (Second) of Torts, §§ 314–324A ... Thus, a passerby seeing a man drown in a pond may have a *moral* obligation to extend a helping hand, but he does not necessarily have a *legal* obligation to do so. *Osterlind v. Hill,* 263 Mass. 73[, 160 N.E. 301] ... (1928) ... Restatement (Second) of Torts, § 314 ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). If, however, the presence of the passerby, say, in the costume of a lifeguard, reasonably led the drowning man to go for a swim, the passerby might then be obliged to make efforts to help. *See* ... Restatement (Second) of Torts, § 314A (special relations giving rise to duty to aid or protect).

*Carrier,* 721 F.2d at 868–69.

The Supreme Judicial Court has explained that the special relationship can exist between the defendant and the plaintiff or between the defendant and the third party wrongdoer:

> The Restatement (Second) of Torts § 315 recognizes two types of special relationships that may form the basis of an exception to the general principle that a person has no duty to control the conduct of a third person. One exception is based on the finding of a special relation between the actor (i.e. the person whose duty is at issue) and the potential plaintiff.... The other exception set forth in the Restatement arises when there is a special relation between the actor and the third person. We have been criticized for overlooking this portion of the Restatement in our analyses ...."

*Jean W. v. Commonwealth,* 414 Mass. 496, 513, 610 N.E.2d 305 (1993);[6] *see also Mosko v. Raytheon Co.,* 416 Mass. 395, 402 n. 7, 622 N.E.2d 1066 (1993) (recognizing that section 315 provides "that a person may have a duty to control the actions of another so as to prevent harm to third parties if a 'special relation' exists between the person and the other who should be controlled"). With regard to the second type of special relationship, section 315 provides that "[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct ...." Restatement (Second) of Torts, § 315.

According to Rakes and Dammers, there is no dispute that there was a "special

---

6. As Judge Lindsay explained in *Davis:*

The Supreme Judicial Court cited [section 315(a)] with approval in *Jean W.* ... and was prepared to apply it to claims brought under the Massachusetts Tort Claims Act. Before the ruling in *Jean W.* was effective, the legislature abrogated *Jean W.* by enacting M.G.L. ch. 258, § 10(h)-(j), greatly limiting the circumstances under which public employees can be liable for failing to provide police protection. There is no indication, however, that § 315(a) is not a basis for liability of a private person or entity. *Davis,* 340 F.Supp.2d at 91 n. 9.

relationship" between Bulger and Flemmi and the FBI. Pls.' Opp'n at 17. The United States does not deny this, but rather argues that the only relationship relevant to the inquiry is that between Rakes and Dammers and the FBI.[7] *See* Def.'s Mem. at 19. The United States' position runs counter to *Jean W.*'s explication of the two types of special relationships recognized in section 315. If there indeed is no dispute between the parties that a special relationship existed between the FBI and Bulger and Flemmi, then it would appear likely that the Supreme Judicial Court would hold that a duty of care arises in this case under section 315.[8] *See Davis,* 340 F.Supp.2d at 93 ("The alleged relationship the government had with Flemmi and Bulger was a 'special relationship' within the meaning of tort law, creating a duty owed to the general public to control them.").

### 3. The Section 876(b) Exception

The Supreme Judicial Court has recognized that "[f]or harm resulting to a third person from the tortious conduct of another, a person is liable if he ... (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other." *Nelson v. Nason,* 343 Mass. 220, 222, 177 N.E.2d 887 (1961) (quoting Restatement (First) of Torts § 876(b) (1939)) (holding a drag racer liable for deaths resulting from a crash between the decedent and another car); *see also Jacobs v. Castronovo,* 59 Mass.App.Ct. 1108, 797 N.E.2d 946 (2003) ("[T]hough not explicitly adopted in Massachusetts, [Restatement (Second) of Torts § 876] has been cited in appellate decisions and, in some instances, has provided the basis for recovery." (quoting *Kurker v. Hill,* 44 Mass.App.Ct. 184, 189, 689 N.E.2d 833 (1998) (internal quotations omitted)).) Judge Lindsay held that section 876(b)'s "substantial assistance" rule applied in *Davis. See Davis,* 340 F.Supp.2d at 93 ("In allegedly permitting Flemmi and Bulger to commit crimes with impunity and not warning the foreseeable victims of those crimes, the government gave Flemmi and Bulger 'substantial assistance' in murdering Davis.").

In *Davis,* Judge Lindsay cited an instructive case from the D.C. Circuit, *Halberstam v. Welch,* 705 F.2d 472 (D.C.Cir. 1983), which was cited with approval in *Alberts v. Devine,* 395 Mass. 59, 71, 479 N.E.2d 113 (1985). The court in *Halberstam* applied section 876(b) to hold that the defendant could be found civilly liable for a murder her boyfriend committed while burglarizing a home. Although the

7. The United States argues that no such "special relationship" exists in this case between the Rakes and Dammers and the FBI. The United States emphasizes that Massachusetts courts have usually imposed a duty to use reasonable care to protect others from injury in cases involving "the defendant's business enterprise or ownership of land, not its relationship to a third party whose criminal acts have allegedly harmed the plaintiff." Def.'s Mem. at 19–20 (collecting cases). Rakes and Dammers argue that a special relationship did exist between themselves and the FBI based on their report of Bulger and Flemmi's extortion of the liquor store. Pls.' Opp'n at 18. Rakes and Dammers's theory seems plausible given that a duty not to act negligently "extends to those who have relied in some special way upon the defendant, to those whom defendants have helped to place in a position where they are likely to depend upon his avoiding negligent omissions." *Carrier,* 721 F.2d at 868–69. Their position is weakened considerably, however, by the fact that they never directly reported the extortion to the FBI, relying instead on Detective Lundbohm.

8. This of course assumes that Rakes and Dammers can present evidence that they have suffered *physical* harm. Section 315, like section 321 discussed earlier, contemplates negligent conduct that results in physical harm. The United States has not challenged the sufficiency of the evidence on this point, therefore the Court does not address it here.

defendant was not at the scene of the crime, the court found that she helped her boyfriend run a criminal enterprise that he was advancing when he committed the murder. 705 F.2d at 488. Even though her acts in disposing stolen goods "were neutral standing alone, they must be evaluated in the context of the enterprise they aided." *Id.* In determining whether the defendant had given "substantial assistance" to her boyfriend, the court looked at "the nature of the act encouraged; the amount [and kind] of assistance given; the defendant's absence or presence at the time of the tort; [her] relation to the tortious actor; and the defendant's state of mind." *Id.* at 483–84 (citing Restatement (Second) of Torts § 876(b) cmt. d (1979)).

Although neither party has cited section 876(b) in their briefs, Judge Lindsay's *Davis* decision is persuasive. It appears that the "substantial assistance" theory may be a viable one for Rakes and Dammers as well.

### D. Conclusion

Of the three issues raised by the United States in its motion for summary judgment on the FTCA claims, the most difficult one for Rakes and Dammers to overcome is the final question of whether Massachusetts recognizes a duty to act and, if so, under what circumstances. Although Massachusetts courts have not yet reached a case as unique—and disturbing—as this one, the Court believes that if presented with the facts of this case, the Supreme Judicial Court would rule that Rakes and Dammers have alleged viable negligence claims based on the FBI's failure to act.[9]

9.  These cases originally alleged *Bivens* claims against certain individual defendants. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Under this theory, in order for the Court to find a substantive due process violation, the conduct of government actors must "shock the conscience." *Aversa v. United States*, 99 F.3d 1200, 1215 (1st Cir.1996); *see Brown v. Hot, Sexy and Safer Prods., Inc.*, 68 F.3d 525, 531 (1st Cir.1995) (citations omitted). Groping for such a test applicable to this case, the Court opined:

> Here's the standard as best I can state it. When a governmental actor has probable cause to believe that a wrongdoer has committed the crime of murder and does not initiate criminal proceedings, more than that, and knows of a substantial likelihood, not probable cause but a substantial likelihood that this same individual will murder again, and then, third, does not initiate criminal proceedings against the wrongdoer, when that governmental actor, one, is not faced with exigent circumstances, has adequate resources to take the wrongdoer into custody, without undue risk to himself, the community or the wrongdoer himself, and fails to act, not through negligence, but for some perceived governmental benefit, then the government is liable and indeed

the governmental actor is liable under *Bivens*, for harm, including harm, reasonably foreseeable harm, this would have to be reasonably foreseeable, but all sorts of harm that the unapprehended wrongdoer thereafter commits to and including the extortion here.

Transcript of hearing, October 25, 2004 at 13. The Court went on to say:

> That's the standard that I propose to apply when you come on to argue your motions, your ... motions for summary judgment on this issue [, i.e. the issue of government liability under the FTCA]. And recognizing that trial is now in the near future, I propose to act promptly, maybe with an opinion to follow, but I propose to act promptly on these motions.
>
> .    .    .    .    .
>
> The matter is all up for argument. I simply try to tell you the current state of my thinking.

*Id.* at 13–14.

True to its word, during oral argument on this motion for summary judgment, the Court braced government counsel:

> THE COURT: [T]here would have to be a deliberate inaction on the part of a government actor, after probable cause to believe that the evildoer had committed a murder or murders and was likely to murder again

The Court, however, need not speculate further on whether Massachusetts would apply Restatement (Second) of Torts §§ 321, 315, and 876(b), or some other exception to Rakes and Dammers's claims. For reasons set forth in *infra* section II, the Court does not reach the United States' motion for summary judgment.

## II. UNITED STATES' RENEWED MOTION TO DISMISS THE FTCA CLAIMS AS TIME–BARRED UNDER THE APPLICABLE STATUTE OF LIMITATIONS

Rakes and Dammers originally filed their FTCA claims on May 11, 2001. The United States first moved to dismiss Dammers's complaint on statute of limitations grounds on August 20, 2002. That motion was taken under advisement on October 22, 2002 and, after a fair amount of internal waffling, denied without opinion on March 20, 2003.

On September 30, 2004, the United States filed a renewed motion to dismiss Rakes and Dammers's claims as time-barred under the FTCA's two-year statute of limitations, 28 U.S.C. § 2401(b), relying on the First Circuit's recent decision in *McIntyre v. United States*, 367 F.3d 38 (1st Cir.2004), discussing the FTCA accrual standard and applying it to two cases

before any liability could be imposed, and the other thing I've already ruled and said, they had the capacity to take them into custody without undue risk. If they meet all those it would seem to me liability would attach.

. . . . .

The duty of government since feudal time is to protect the [safety] of its citizens. Government simply is not empowered among men and women to choose who it will protect and who it will allow to be murdered. Government officials cannot make that choice absent exigent circumstances. They cannot. It's the basic compact between the people and their government. The government may fail. The government may be negligent. No recovery here. But if government actors intentionally refrain, pursuing some other goal, from taking these people into custody, knowing it was likely they would murder again, then it seems to me that the government, a government that would do that is liable for the harm.

Transcript of motion hearing, November 16, 2004 at 5–7.

The trouble with all this was that the *Bivens* allegations had voluntarily been withdrawn by the plaintiffs before the motion hearing and, as government counsel patiently pointed out, the Court was here erroneously conflating a standard for determining what "shocks the conscience" for a substantive due process violation under *Bivens* with a standard for government liability under the FTCA.

The two standards are entirely different and, given a chance to reflect, the Court readily confesses its error. Whatever the value of the standard just enunciated to a *Bivens* analysis, it has no place in the FTCA analysis under Massachusetts law. It is true that since feudal times, *see* F.L. Ganshof, *Feudalism* xv-xviii (Philip Grierson trans., Longmans, Green & Co. 1st English ed.1952) (1944), it has been recognized that governments primarily exist to secure the safety of their citizens, *see* Thomas Hobbes, Leviathan ch. 30 at 231 (Richard Tuck ed., Cambridge Univ. Press 1991) (in English) ("*Summi imperantis officia ... manifeste indicat institutionis finis nimirum salus populi* " or "The office of the sovereign ... consisteth in the end, for which he was trusted with the sovereign power, namely the procuration of the safety of the people."); The Federalist No. 3, at 42 (John Jay) (Clinton Rossiter ed., 1961) ("Among the many objects to which a wise and free people find it necessary to direct their attention, that of providing for their SAFETY seems to be the first."); The Federalist No. 8 (Alexander Hamilton), at 67 ("Safety from external danger is the most powerful director of national conduct. Even the ardent love of liberty will, after a time, give way to its dictates."); Charles de Secondat, Baron de Montesquieu, The Spirit of the Laws (Thomas Nugent trans., J.V. Prichard, ed., G. Bell & Sons, Ltd.1914). This, however, is the general relationship of a government to its citizens, not the special relationship that forms an exception to the general rule on no tort liability for inaction.

involving the FBI's relationship with Bulger and Flemmi. The United States argues that under *McIntyre*'s objective accrual test, Rakes and Dammers should have discovered the factual basis for their FTCA claims before the cut-off date of May 11, 1999. In opposition, Rakes and Dammers contend their claims did not accrue until September 15, 1999, the day Judge Wolf issued his opinion in *United States v. Salemme*, 91 F.Supp.2d 141. Given the import of *McIntyre* to this case, the statute of limitations issue deserves a second look.

### A. Facts

### 1. Judge Wolf's Factual Findings In *Salemme* Regarding The Extortion of Rakes and Dammers's Liquor Store

On September 15, 1999, Judge Wolf issued a lengthy decision in *United States v. Salemme*, laying out a possible pattern of corruption involving FBI agent Connolly and his supervisor Morris, and Bulger and Flemmi, two leaders of the Winter Hill Gang. The opinion recounted that since the 1970s, Bulger and Flemmi were top-level FBI informants providing information to the agency about La Cosa Nostra. It also suggested that Bulger and Flemmi had received special treatment from the FBI, including protection from prosecution and access to the names of other informants. *Salemme*, 91 F.Supp.2d at 148–63, 322.

Relying on the September 29, 1998 testimony of Dammers's uncle, Boston Police Detective Joseph Lundbohm, and the June 4, 1998 testimony of Supervisory Special Agent of the Boston Office James A. Ring, Judge Wolf made several factual findings relevant to Rakes and Dammers's extortion claims:

> In about January 1984, Connolly received very reliable information concerning an ongoing extortion by Bulger and Flemmi. In violation of FBI policy and practice, Connolly did not record the information or disclose it to his Supervisor as required by the FBI Guidelines. Nor did he try to obtain the testimony of the victims or conduct any other investigation. Instead, he told Bulger of the charges.

In January 1984, Joseph Lundbohm was a Boston Police Detective. Lundbohm Sept. 29, 1998 Tr. at 112–18. Lundbohm's niece, Julie Rakes, and her husband Stephen had recently bought a liquor store in South Boston. *Id.* at 116.

Bulger and Flemmi evidently decided that the store would be an excellent hub for their activities. They, and Kevin Weeks, visited the Rakes and said they wanted to buy the liquor store. *Id.* The Rakes told them that it was not for sale. *Id.* Flemmi responded by pulling out a gun, commenting on how lovely the Rakes's young child was, and reiterating that they were going to buy the liquor store. *Id.* at 116–17.

The Rakes sought Lundbohm's assistance, telling him what occurred. *Id.* at 116. Lundbohm knew that Bulger and Flemmi were reputed to be dangerous members of organized crime. *Id.* at 138. He felt that the FBI would be the most appropriate law enforcement agency to investigate the ongoing extortion. *Id.* at 134. He did not know that Bulger and Flemmi were FBI informants, or that Connolly was their handler. *Id.* at 123, 145.

Lundbohm was acquainted with Connolly professionally, knew that he was involved in investigating organized crime and, with the Rakes's consent, decided to speak with Connolly in an effort to prompt an FBI investigation. *Id.* at 118. Lundbohm related to Connolly what the Rakes had told him. *Id.* at 119. Connolly asked whether the Rakes would "wear a wire" to record conversa-

tions with Bulger, Flemmi, and Weeks. *Id.* at 119, 126. Lundbohm indicated that he would advise them not to do so. *Id.* Connolly responded that he would take the information, but did not feel that there was much that the FBI could do. *Id.*

Connolly made no record of the information Lundbohm had provided to him. Nor did he disclose it to Ring, who had become the Acting Supervisor of the Organized Crime squad in January 1983. Ring June 4, 1998 Tr. at 44. Connolly did, however, tell Bulger of his conversation with Lundbohm. Bulger subsequently urged the Rakes to "back off." Lundbohm Sept. 29, 1998 Tr. at 122. Lundbohm correctly inferred that Bulger had learned that the Rakes had been trying to generate an FBI investigation of him. *Id.* at 122, 139–40.

The FBI did not investigate the extortion of the Rakes in any way. More specifically, Connolly did nothing to attempt to obtain the testimony of Mr. and Mrs. Rakes. Nor did he do anything else to acquire evidence of the effort of Bulger and Flemmi to frighten them into selling their liquor store. In any event, the extortionate scheme succeeded. The Rakes reluctantly sold their liquor store to Bulger and Flemmi. *Id.* at 117. It was re-named the South Boston Liquor Mart, and in the near future became a focus of the investigative efforts of several law enforcement agencies, not including the FBI.

*Salemme*, 91 F.Supp.2d at 215–16.

The facts of the 1984 extortion as alleged in Rakes and Dammers's complaints closely track Judge Wolf's findings in *Salemme*. The complaints add, however, that for the next ten years, Rakes and Dammers continued to receive threats from the Gang, including a threat delivered by Bulger to Rakes in 1991, right before Rakes was to testify before a grand jury. *See, e.g.,* Rakes Compl. ¶¶ 355–360. The complaints allege that Rakes, out of fear, testified falsely before the grand jury in 1991 and again in 1995, and was later convicted of perjury. *Id.* ¶¶ 361–368.

## 2. Boston News Coverage Of The FBI's Relationship With Bulger And Flemmi

As early as September 20, 1988, the *Boston Globe* reported that the FBI "has for years had a special relationship with Bulger that has divided law enforcement bitterly and poisoned relations among many investigators." The Globe Spotlight Team, *The Bulger Mystique: Law Enforcement Officials' Lament About An Elusive Foe: Where Was Whitey?*, Boston Globe, Sept. 20, 1988, at 18. The 1988 article specifically questioned the propriety of Connolly's relationship with Bulger, yet, like many other news pieces that followed over the years, it also reported the FBI's vehement denials of any wrongdoing. *See, e.g., id.* at 19 (quoting James F. Ahearn, special agent in charge of the Boston office, as unequivocally denying that the FBI gave any "special treatment" to Bulger); Dick Lehr, *Finnerty Is Attorney For FBI Agent*, Boston Globe, March 24, 1989, at 16 (rejecting "the notion that Bulger has had relations with the bureau that have left him free of its scrutiny"); Kevin Cullen, *Southie Is His Hometown; Whitey Bulger: Man And Myth*, Boston Globe, Aug. 12, 1990 (reporting that Bulger's informant relationship with the FBI "has led some in law enforcement who have targeted Bulger to suspect that some FBI agents have somehow helped Bulger avoid prosecution"); Dick Lehr & Kevin Cullen, *Liquor Purchase Fuels Friction Over FBI–Whitey Bulger Tie*, Boston Globe, Nov. 11, 1990, at 44–45 (reporting the FBI's purchase of liquor from the South Boston Liquor Mart, the "widely held perception in law enforcement that Bulger has ex-

ploited the FBI," and the FBI's strong denials of any impropriety).

General suspicions regarding the FBI's relationship with Bulger continued into the 1990s, as Bulger consistently managed to stay one step ahead of the law. After indictments were unsealed against Bulger and Flemmi, the *Boston Globe* reported that "[s]ome prosecutors concede [Bulger] may be able to counter the racketeering charge with an allegation of his own—that his criminal activity was just part of doing his job for the FBI." Gerard O'Neill, Dick Lehr, & Kevin Cullen, *New Team, Tactics Hastened Whitey Bulger's Fall*, Boston Globe, March 5, 1995. According to the same article, this sentiment was echoed by an unnamed, "high-level law enforcement official" who suggested that "there would be as much trouble as glory for the FBI in building a case against Bulger." *Id.* Despite the rumors of impropriety, the *Boston Globe* reported in 1995 that "[n]o one has ever shown the FBI to be an active protector of Bulger—indeed, such a view is widely condemned as grossly unfair." Dick Lehr, *Bulger's Flight Spares FBI Burden Of Ties Being Aired, Insiders Say*, Boston Globe, March 5, 1995, at 24.

Evidence of the FBI's protection of Bulger and Flemmi first began to surface in the press during the summer of 1997. On June 26, 1997, the *Boston Globe* reported that Flemmi was asserting in the *Salemme* proceedings that FBI agent Morris gave him and Bulger assurances that they could continue to commit crimes without risk of prosecution in exchange for information about organized crime activities. Patricia Nealon, *Flemmi Says He, Bulger Got FBI's OK On Crimes*, Boston Globe, June 26, 1997, at Al (attaching Flemmi's affidavit attesting that "Mr. Morris told Mr. Bulger and I that we could do anything we wanted so long as we didn't 'clip anyone.' On several occasions, . . . Mr. Bulger and I were assured that we could be involved in

any criminal activities short of committing murder and we would be 'protected.' I operated and relied upon this express agreement with the FBI"). It was also reported that Flemmi was contending in the *Salemme* proceedings that the FBI had tipped him to the date that his indictment was to be returned so that he could flee. *Id.* The *Boston Globe* reported, however, that Flemmi's affidavit was contradicted by an affidavit filed by Paul E. Coffey, chief of the Justice Department's Organized Crime and Racketeering Section, stating that Flemmi and Bulger were warned that they were not authorized to commit crimes unless they received specific permission, which they did not receive. *Id.* On the other hand, the article also reported that Flemmi's contentions were supported by a January, 1995 report by the chief division counsel of the Boston office of the FBI concluding that Flemmi's handlers had implicitly authorized his illegal gambling activities and involvement in La Cosa Nostra policy-making. *Id.*

On December 5, 1997, the *Boston Herald* reported Judge Wolf's statement that the FBI's Office of Professional Responsibility found "no evidence of continuing criminal conduct within the statute of limitations" by Morris or Connolly. Ralph Ranalli, *Justice Dept. Clears Ex–FBI Agents In Mob Case*, Boston Herald, Dec. 5, 1997, at 24 (internal quotations omitted). The article added that notwithstanding the report, Morris and Connolly might still invoke their Fifth Amendment rights against self-incrimination if called to testify in the *Salemme* proceedings. *Id.*

On January 7, 1998, the *Boston Herald* reported on the opening arguments in the *Salemme* proceedings:

Winter Hill wiseguy and FBI informant Stephen "The Rifleman" Flemmi said he was rewarded for his work for the agency with a free pass on murder,

attempted murder and fugitive charges in the mid–1970's, defense lawyers alleged yesterday.

The alleged promise and delivery of that protection helped seal Flemmi's loyalty to the bureau for the next 20 years and was proof that the FBI gave the Quincy gangster "immunity" from prosecution for his crimes, the lawyers said during opening arguments in hearings on the FBI's informant relationships with Flemmi, 63, and ... Bulger, 67. . . .

In a brief opening statement yesterday, a federal prosecutor scoffed at the defense assertions, saying they were tantamount to Flemmi saying he was a "Junior G–Man" with a license to kill.

"He's saying 'I can kill people! I can blow up lawyers!'" Assistant U.S. Attorney Fred M. Wyshak said. "Isn't that preposterous?"

Ralph Ranalli, *Mobster: I Had License To Kill Flemmi Says FBI Knew He Was Murderer*, Boston Herald, Jan. 7, 1998. The article also stated that Connolly would not testify in the proceedings, citing his Fifth Amendment right not to incriminate himself. *Id.*

On January 9, 1998, the *Boston Globe* published a story stating that "[t]he FBI had looked the other way before when it came to their prized informants" Bulger and Flemmi:

[A]fter Bulger and Flemmi were named as suspects in the gangland-style murders of a millionaire jai alai company owner and an associate, the FBI continued taking information from them, even after each refused to take a polygraph test in connection with the slayings.

So shielded were Bulger and Flemmi that the head of the FBI's Boston office, James W. Greenleaf, testified yesterday that he didn't know that Bulger and Flemmi had refused to take lie detector tests, nor was he told that the two were implicated in gambling, loansharking, drug dealing and extortion.

Greenleaf, who headed the Boston FBI office from November of 1982 until December of 1986, testified at length about a 1984 investigation undertaken by the DEA and the Quincy police into Bulger and Flemmi's alleged trafficking in cocaine.

. . . .

[D]espite its willingness to assist the DEA in its investigation of Bulger and Flemmi, Greenleaf acknowledged under questioning by Flemmi's lawyer ... that the FBI never initiated a probe of Bulger or Flemmi while Greenleaf was in charge of the Boston office.

He also said he was not aware that Bulger and Flemmi had refused to take a polygraph test when questioned about the murders of World Jai Lai owner Roger Wheeler and associate John Callahan.

Patricia Nealon, *FBI Loyalty To Mob Duo Is Detailed: DEA, Others Kept In Dark About Bulger, Flemmi Ties*, Boston Globe, Jan. 9, 1998, at B1. The article also stated that Greenleaf and former Special Agent in Charge Lawrence Sarhatt had testified that Bulger and Flemmi were not given permission to commit crimes. *Id.* In a subsequent article, the *Boston Herald* reported that FBI agent Paul Rico likewise testified that he did not promise to protect Flemmi from prosecution in exchange for information on the Mob. David Weber, *Flemmi's Lawyer Contends Fed Let His Crimes Slide*, Boston Herald, Jan. 14, 1998, at 10.

In an article published on May 28, 1998, the *Boston Globe*, citing *Globe* interviews and grand jury testimony read in court, reported in detail the extortion of Rakes and Dammers's liquor store, their complaint to Boston police detective Lundbohm, and Lundbohm's report of the

extortion to agent Connolly. Shelley Murphy, *Mobster's Takeover Of Store Recounted*, Boston Globe, May 28, 1998, at A1. The news story recounted Bulger, Flemmi, and Weeks's visit to the Rakes home in January 1984, their threats to Rakes's family, and how "[t]hey carried a gun, a bag stuffed with $67,000 cash, and an offer Rakes couldn't refuse." *Id.* The article also reported that when Lundbohm "tried to help [the Rakes family] by reporting the strongarm tactics of Bulger and Flemmi to the FBI, he unwittingly talked to the very agent who was their 'handler,' John Connolly." *Id.* According to the piece, Lundbohm said he knew Connolly from various cases he had worked on and had arranged to meet Connolly for coffee. *Id.* In an interview with the *Boston Globe*, Connolly admitted that "he vaguely recalls being told that the Rakeses were being threatened into selling their store, but that 'they did not want to get wired up and they did not want to be witnesses.'" *Id.* The article went on to mention specifically Julie Rakes's grand jury testimony and the perjury trial against Stephen Rakes. *Id.; see also* Shelley Murphy, *Woman Says Bulger Shielded, But Husband Charged*, Boston Globe, May 30, 1998, at B6 (discussing the liquor store extortion and reporting that Julie Rakes said at Stephen Rakes's trial that "she couldn't understand why the IRS is prosecuting her ex-husband [and] [s]he noted the FBI took no action against Bulger in 1984"); David Weber, *Merchant's Ex–Wife Details Mob Buyout*, Boston Herald, May 31, 1998, at 5 (recounting Julie Rakes's testimony regarding the extortion).

On June 17, 1998, the *Boston Globe* reported that during a brief telephone interview with the newspaper, Connolly denied ever talking to Bulger about the extortion of Rakes and Dammers's liquor store. Dick Lehr, *Ex-detective's Testimony OK'd In Perjury Trial*, Boston Globe, June 17, 1998, at F12. The article quoted Connolly as stating: "I never had any reason to discuss my conversation with Mr. Lundbohm with Mr. Bulger, and I never did." *Id.* (internal quotations omitted). On the same day, the *Boston Herald* reported that according to Lundbohm's testimony, after Lundbohm had spoken with Connolly about the extortion, Stephen Rakes told Lundbohm that "Whitey said to back off." David Weber, *Whitey Told Store Owner To 'Back Off' From Authorities*, Boston Herald, June 17, 1998, at 32. The article stated that "Lundbohm said he understood that to mean that 'Bulger had some knowledge of the conversation with Mr. Connolly.'" *Id.* The article reported that Connolly again denied having any conversation with Bulger about the extortion. *Id.* Lundbohm testified that former Boston Police Superintendent Anthony DiNatale was the only other person who knew about his conversation with Connolly. *Id.*

The *Boston Globe* reported Rakes's conviction for perjury on June 25, 1998. Marcella Bombardieri, *Jury Convicts Man Of Perjury For Denying Gangsters' Coercion*, Boston Globe, June 25, 1998, at B4. The article mentioned Flemmi's contention that he was granted immunity from prosecution and Lundbohm's report of the extortion to Connolly. *Id.*

The *Boston Globe* published an article on July 22, 1998, specifically mentioning the Rakes and Dammers extortion and describing Bulger and Flemmi as career criminals "sanctioned" by the FBI:

At the dawn of his deal with the FBI, James "Whitey" Bulger was an angry leg breaker at a Dedham restaurant looking to collect an unpaid loan. Leaning across a table, he gave the owner a choice: Pay, or have his ears cut off and stuffed in his mouth.

Restaurateur Francis X. Green told his story to the FBI, expecting protec-

tion and prosecution. But Bulger had an ace in the hole. He worked for the FBI.

Looking back, the 1976 incident at the Back Side Restaurant was a turning point. An extortion case, built on a credible, cooperative witness, might have stopped Bulger and his partner, Stephen "The Rifleman" Flemmi, from launching a 15–year crime spree.

Instead, the FBI did nothing, sending a powerful message to two of the region's most ruthless organized crime figures: As long as you're with us, we won't bother you.

As a result, Bulger and Flemmi became sanctioned career criminals while spying on the underworld for the FBI. Despite solid evidence indicating Bulger and Flemmi were involved in murders, shakedowns, and drug dealing, the FBI looked the other way throughout the 1970s and 1980s.

It made no difference who the victims were, fellow wise guys or innocent people. And it didn't matter if the victims were willing to cooperate with the FBI or were scared silent. In some cases, the bureau even helped the gangsters by leaking information to them about ongoing investigations.

Recent court testimony shows the deflected cases ranged from the momentous to the mundane, but the consistent thread running through most of them is the involvement of Bulger's handler, former FBI agent John Connolly of South Boston.

Some potential cases that went nowhere:

— In 1982, a wise guy turned FBI informant was gunned down after Connolly, according to [Morris's] testimony, told Bulger and Flemmi that the man had implicated them in a string of gangland slayings and the murder of an Oklahoma businessman.

— In 1984, a Boston police detective told Connolly that Bulger and Flemmi were trying to seize a liquor store owned by the detective's relatives with a "can't refuse" offer. But Connolly did not report the incident to superiors and, within days, Bulger sent word to the victims that he knew they had complained to the FBI and warned them to "back off."

— In the late 1980s, FBI agents John Newton and Roderick Kennedy failed to document or follow up on a realtor's claim that a gun-toting Bulger threatened to stuff him in a body bag if the realtor didn't pay him $50,000.

— In 1988, another FBI agent, supervisor John Morris, who [according to his own testimony] had pocketed $7,000 in payoffs from Bulger, warned Bulger and Flemmi that the FBI had tapped the telephone of a Roxbury bookmaker who worked for them. While indictments resulted from the wiretap, including some Boston policemen for taking payoffs, Bulger and Flemmi went untouched.

Although there is evidence that Connolly protected Bulger and Flemmi, he was not alone. Supervisors and fellow agents often were swayed by his claim there was insufficient evidence to target the pair or that they were too valuable to the FBI.

For example, FBI agent James Blackburn testified he never pursued allegations that Bulger was shaking down a South Boston drug dealer in 1988 after Connolly told him it wasn't true. And agent James J. Lavin III testified that in 1987 he ignored evidence that city workers erected guardrails on private property outside the South Boston liquor store controlled by Bulger after Connolly reminded him that Bulger was an indispensable informant.

In the end, Bulger and Flemmi were always suspects, but never defendants; always informants, never targets.

Last April, Connolly refused to testify at federal court hearings exploring the FBI's controversial relationship with Bulger and Flemmi, citing his Fifth Amendment right not to incriminate himself. In interviews, he has accused other agents of lying when they testified critically about his handling of Bulger and Flemmi.

"I'm not a rogue agent," Connolly said recently. "Anything I ever did, I did lawfully. I have no trouble with what I did. I did it for the FBI, all the way to D.C., constant oversight."

But the record now shows that the deal—protection for information—left the bureau shortchanged, co-opted, and compromised.

In a telling aside during recent testimony, one of Connolly's closest associates in the bureau, former agent Nicholas Gianturco, talked about entertaining Bulger and Flemmi at his Peabody home. "I felt comfortable having them to the house," he said. "It was not an adversarial relationship."

Shelly Murphy, *Cases Disappear As FBI Looks Away*, Boston Globe, July 22, 1998, at Al. The article reported that Lundbohm had said that he suspected Connolly had tipped Bulger about their meeting regarding the extortion. *Id.* Although Connolly denied leaking the information, the article reported that "federal prosecutors said a search of FBI files failed to uncover any paperwork on [the incident]," and the article concluded that "[i]t appears Connolly made a unilateral decision to neither investigate the extortion nor pass it along to a supervisor." *Id.*

On September 23, 1998, the *Boston Herald* ran an article summarizing the testimony of Supervisory Special Agent of the Boston Office James A. Ring in the *Sa-lemme* proceedings. David Weber, *Ex–FBI Agent Accused Of Keeping Informant Info*, Boston Herald, Sept. 23, 1998, at 27. The article stated that "Ring alleged that Connolly was clearly out of line when he failed to pass on information that Bulger and Flemmi committed extortion in 1984 against South Boston liquor store owner Stephen 'Stippo' Rakes by forcing Rakes to sell his store to them." *Id.* Ring was quoted as testifying "I would have definitely expected (Connolly) to come to me and discuss it ... He didn't have the authority to handle that on his own." *Id.* The article also reported that "Ring said Connolly never said or indicated that he (Connolly) believed the two reputed mobsters had an immunity deal with the government." *Id.*

In an article specifically mentioning the extortion of Rakes and Dammers's liquor store and Lundbohm's meeting with Connolly, the *Boston Globe* reported on September 30, 1998 that Flemmi's defense lawyers were arguing that Flemmi and Bulger were "protected by their bureau handlers, who violated the agency's own guidelines." Ralph Rinalli, *Supervisor: Promises to Informants Tripped FBI*, Boston Herald, Sept. 30, 1998, at 14. The article summarized the testimony of a former FBI supervisor who pointed out a "Catch–22" in the FBI's handling of informants. *Id.* Although "[t]he guidelines call on the FBI, in certain circumstances, to notify other agencies when their informants have committed serious crimes," the agency "is hamstrung by the promises made to keep [informants'] identities secret." *Id.*

**B. Standard of Review and Accrual Under The FTCA**

On the United States' motion to dismiss, the Court "must construe the complaint liberally, treating all well-pleaded facts as true and drawing all reasonable inferences

in favor of the plaintiffs." *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir.1998). In addition, in order to determine jurisdiction, the Court can consider evidence submitted by the parties and, if necessary, settle factual disputes. *See Valedon Martinez v. Hospital Presbiteriano de la Comunidad, Inc.*, 806 F.2d 1128, 1132 (1st Cir.1986); *Heinrich v. Sweet*, 44 F.Supp.2d 408, 415 (D.Mass.1999). Therefore, it is appropriate to consider supplemental materials as they are attached to the pleadings before this Court. Such consideration does not, however, require the Court to treat this motion as one for summary judgment. *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir.2002) ("The attachment of exhibits to a Rule 12(b)(1) motion does not convert it to a Rule 56 motion.").

Recently, the First Circuit considered a consolidated appeal of Judge Lindsay's dismissal of FTCA claims in *McIntyre v. United States*, 254 F.Supp.2d 183 (D.Mass. 2003) (involving the alleged wrongful death of John McIntyre of Massachusetts), and *Wheeler v. United States*, No. 02–10464–RCL (D.Mass. March 31, 2003) (involving the alleged wrongful death of Roger Wheeler of Oklahoma), on the grounds that the plaintiffs did not file their claims within the required two-year period from the accrual of the cause of action. *See McIntyre v. United States*, 367 F.3d 38 (1st Cir.2004). The First Circuit reversed Judge Lindsay's decision in the McIntyre case and affirmed his dismissal of the FTCA claims in the Wheeler case. *Id.* The court's discussion and application of the applicable FTCA accrual standard is illuminating and governs this Court's approach to the instant motion to dismiss.

■ The FTCA provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). As a waiver of sover-

eign immunity, the FTCA is strictly construed. *Skwira v. United States*, 344 F.3d 64, 73 (1st Cir.2003). In determining when McIntyre and Wheeler's FTCA claims accrued, the First Circuit applied the discovery rule, which provides that "a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the factual basis for the cause of action." *McIntyre*, 367 F.3d at 52 (internal quotations and citations omitted). "The test for whether a plaintiff should have discovered necessary facts is an *objective* one." *Id.* (emphasis added). According to the court, the test has two parts:

> We look first to whether sufficient facts were available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further. "A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a *duty to inquire* into the possible existence of a claim in the exercise of due diligence." Once a duty to inquire is established, the plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation. The next question is whether the plaintiff, if armed with the results of that investigation, would know enough to permit a reasonable person to believe that she had been injured and that there is a causal connection between the government and her injury. Definitive knowledge is not necessary. This inquiry is highly fact- and case-specific, as are the pertinent questions to ask.

*Id.* (citations omitted).

In applying the discovery rule to the McIntyres' claims, the First Circuit explained that the claims "are based on two interrelated theories of how the FBI caused McIntyre's death":

(1) by leaking his confidential informant status to Bulger and Flemmi, in violation of a special duty of non-disclosure owed to him by the government, and (2) by protecting Bulger and Flemmi from investigation and prosecution, thus enabling and emboldening them to murder him.

*Id.* at 53–54 (paragraph structure altered). The court noted that the second theory "is meant to buttress the first theory" and "perhaps also meant to serve as an independent basis of liability." *Id.* at 54. The court went on to explain that the first "predominant theory depends on the following reasoning:"

1. McIntyre was cooperating with the government in its investigation of Bulger and Flemmi, which imposed a duty on the FBI;

2. McIntyre was murdered;

3. Bulger and Flemmi were responsible for the murder;

4. McIntyre was murdered because Bulger and Flemmi learned he was informing on them to government authorities;

5. It was agents of the FBI, Connolly and/or Morris, who told Bulger and Flemmi that McIntyre was cooperating with the FBI.

*Id.* The court held that the district court had erred in not considering the fourth and fifth points in its accrual analysis. *Id.* Focusing on the fifth point, i.e., "whether a reasonable person in the McIntyres' position, after conducting a diligent investigation, would have uncovered a sufficient factual basis to believe, before [the relevant accrual date of] May 25, 1998, that the FBI was the source of the leak to Bulger and Flemmi," the First Circuit concluded that a reasonable person in that position would not have. *Id.*

In support of its position, the United States had presented the First Circuit with various news articles published before May 25, 1998 and with testimony from the *Salemme* hearing on April 15, 1998. *Id.* at 54–56. The court considered each in turn, but held that the evidence was not enough to trigger accrual given McIntyre's claims. Of a June 1997 *Boston Globe* article that suggested implicitly that Bulger and Flemmi had somehow found out that McIntyre was an informant, the court emphasized that "the article never even mentioned the possibility that the FBI had disclosed this information to Bulger and Flemmi or had otherwise given its imprimatur to the murder." *Id.* at 54–55. Moreover, according to the court, "the McIntyres did not have a reasoned basis to believe that it was *the FBI* that had leaked McIntyre's identity as an informant," *id.* at 55 (emphasis added), because the government itself had repeatedly denied any wrongdoing in *Boston Globe* and *Boston Herald* articles from 1988 through 1997. *Id.* The court also discounted the April 15, 1998 testimony of DEA Agent Stutman at the *Salemme* hearings, in which he stated that the FBI had compromised the DEA's investigation of Bulger and Flemmi. *Id.* The court reasoned that although Agent Stutman's testimony may suggest that the FBI had tipped Bulger and Flemmi to listening devices or warned them of raids, "it does not provide a reasoned basis to believe that the FBI leaked McIntyre's informant status to Bulger and Flemmi." *Id.* Finally, the court rejected the United States' argument that an April 23, 1998 *Boston Herald* story reporting that the FBI had leaked to Bulger and Flemmi the identity of a different informant, at a different time, and involving a different underlying crime, provided sufficient facts for a reasonable person to believe that the FBI had also leaked McIntyre's identity. *Id.*

The court, in conclusion, held that "[e]ven assuming arguendo that the *Boston Herald* article was enough to lead the McIntyres to *suspect* that the FBI leaked

McIntyre's identity, and thus to trigger a *duty to inquire,* a reasonably diligent investigation would still not have revealed the necessary factual predicate for their claim before the accrual date." *Id.* As the court explained, the McIntyres would likely have been kept in the dark:

> Most avenues of investigation were cut off by the possibility of criminal liability for any FBI agents and others involved. Attempts to gain information through depositions would likely have been thwarted by invocations of the Fifth Amendment privilege against self-incrimination. And other information— such as testimony before the grand jury or facts discovered in the government investigation—was hidden behind a veil of secrecy. In this sense, the McIntyres had even less access to critical information than most FTCA plaintiffs.

*Id.* at 55–56. The court noted that "[e]ven Judge Wolf had great difficulty in prying loose coherent information about McIntyre's death by the date of his opinion." *Id.* at 57 (citing Judge Wolf's comment in *Salemme* that "the question of whether the FBI disclosed McIntyre's identity could not 'be resolved on the present record' ").

Turning to the application of the discovery rule to the Wheelers' claims, the First Circuit explained that the claims are "based on a fundamentally different legal theory than the McIntyre case." *Id.* at 57. "Unlike the McIntyre case, which is based on duties arising from the government/informant relationship, the Wheelers' claim is not based on any direct relationship between Roger Wheeler and the FBI." *Id.* The Wheelers' wrongful death claims are based on direct and vicarious liability:

> [ (1) ] They assert that the United States is vicariously liable for the actions of Connolly, Morris, and other agents, which provided Bulger and Flemmi with a "protective shield" against prosecution and investigation that gave the two

criminals the opportunity to commit crimes and emboldened them to do so, proximately causing Wheeler's murder.

> [ (2) ] The Wheelers also assert that the United States is directly liable for failing to prevent Wheeler's murder, in light of the foreseeable risk that Bulger and Flemmi would continue to engage in violent criminal activity.

> [ (3) ] In addition, the Wheelers assert a generalized count against the United States for intentional infliction of emotional distress based on Wheeler's murder.

*Id.* at 58 (paragraph structure altered). The court explained that "[f]or the Wheelers' claims to accrue, there had to be facts available that would permit a reasonable person to conclude":

> (1) that Bulger and Flemmi were instrumental in the murder of Roger Wheeler;

> (2) that Bulger and Flemmi were informants for the FBI; and

> (3) that the FBI had a special relationship with Bulger and Flemmi that protected and encouraged them in their criminal activity including Wheeler's murder.

*Id.* (paragraph structure altered). The court easily ruled that the Wheelers had sufficient notice of the first two points before the May 11, 1999 accrual date, and therefore focused much of its attention on the third set of facts. *Id.* at 58–59. Ultimately, the court held that each of the Wheelers was on notice of sufficient facts present in the Boston and Oklahoma television and press coverage to allow a reasonable person to infer a causal connection between the FBI's conduct and Roger Wheeler's murder. *Id.* at 59–60.

The court held the following news coverage relevant to its analysis:

> 1. On May 10, 1998, Ed Bradley of "60 Minutes" reported that the FBI and Bulger and Flemmi had an "extraordinary relationship" that "may have al-

lowed [them] to get away with murder." *Id.* at 58 (internal quotations omitted). A detective interviewed for the show described Bulger and Flemmi as having a " 'license' from the FBI to commit crimes that 'covered a homicide.' " *Id.* David Wheeler was also interviewed for the show. *Id.*

2. "Two *Tulsa World* articles on July 11, 1997 and January 9, 1998, both of which specifically mentioned the Wheeler murder, reported that Flemmi was claiming in the *Salemme* proceedings that the FBI gave him and Bulger immunity from prosecution for their ongoing criminal activities in exchange for information about organized crime activities." *Id.* at 58–59. On May 10, 1998, a local Tulsa news station "reported that the FBI had tipped Bulger and Flemmi to Halloran's cooperation in the Wheeler murder investigation and that Boston FBI agents may have taken bribes from Bulger and Flemmi." *Id.* at 59.

3. In the summer of 1998, the *Tulsa World* and the *Boston Globe,* in articles that quoted David Wheeler and mentioned the Wheeler murder, reported that Morris had testified that the FBI had shielded Bulger and Flemmi, as two top informants, from prosecution for twenty years. *Id.*

4. On May 12, 1998, the *Boston Herald* reported that David Wheeler had said "in an interview that he 'always believed' that former FBI agent Paul Rico 'facilitated' his father's murder at the hands of Bulger and Flemmi." *Id.* The *Boston Globe* also reported on September 29, 1998 that David Wheeler expressed his belief that John Martorano's cooperation would bring to light "people who have enjoyed the protection of the FBI for many years while committing heinous crimes." *Id.* (internal quotations omitted).

The court held this news coverage clearly sufficient to establish that David Wheeler was on notice of his claims before May 11, 1999. *Id.*

David Wheeler's knowledge, however, could not automatically be attributed to all of the other Wheelers. The court clarified that "the 'knew or reasonably should have known' question must be asked individually, as to the information available to someone in each plaintiff's situation." *Id.* Both geography and the strength of the family members' connections were considered by the court in its analysis. *Id.* at 60. After reviewing what a reasonable person in each of the Wheelers' situations should have known, the court held that each of the Wheelers was on notice of sufficient facts to raise suspicions invoking the duty to inquire further, and "[h]ad the Wheelers inquired further, the requisite facts were present in the Boston and Oklahoma television and press coverage to allow a reasonable person to infer a causal connection between the FBI's actions and Roger Wheeler's murder." *Id.* at 60.

C. **Application to Rakes and Dammers's Claims**

■ Rakes and Dammers filed their claims on May 11, 2001. Therefore, the cut-off date for accrual of their FTCA claims is May 11, 1999. The United States contends that there were sufficient facts available before May 11, 1999 that would permit a reasonable person to infer a causal connection between the FBI's conduct and the extortion of Rakes and Dammers's liquor store.[10] Rakes and Dammers argue

10. The United States also argues that Rakes and Dammers had *actual* knowledge of the critical facts underlying their FTCA claims. The issue of actual knowledge, as it relates to Dammers, was already considered by this Court in the United States' first motion to dismiss on statute of limitations grounds, and this Court sees no need to revisit it. For reasons set forth in this opinion, the Court

that sufficient facts were not available until September 15, 1999, the date of Judge Wolf's decision in *Salemme*.

Rakes and Dammers's claims are based on three related theories of how the FBI caused the extortion of Rakes and Dammers's liquor store: (1) by protecting Bulger and Flemmi from investigation and prosecution, thus emboldening them to extort Rakes and Dammers; (2) by leaking Rakes and Dammers's extortion complaint to Bulger; and (3) by failing to ensure that Connolly and Morris followed FBI Guidelines in their handling of Bulger and Flemmi.

The first theory of liability resembles that addressed by the First Circuit in the Wheeler case. *See McIntyre*, 367 F.3d at 58. Adapting the First Circuit's analysis of the Wheelers' claims to this case, the Court holds that for Rakes and Dammers's claims to accrue under this first theory, there had to be facts available that would permit a reasonable person to conclude: (1) that Bulger and Flemmi were instrumental in the extortion of Rakes and Dammers; (2) that Bulger and Flemmi were informants for the FBI; and (3) that the FBI had a special relationship with Bulger and Flemmi that protected and encouraged them in their criminal activity, including the extortion of Rakes and Dammers. *See id.*

Rakes and Dammers concede that they had sufficient notice of the first two sets of facts before the accrual date of May 11, 1999. The parties dispute, however, whether reasonable persons in Rakes and Dammers's positions would be on notice of the third set of facts. In approaching the contested issue, this Court begins its analysis with a review of the relevant media coverage prior to May 11, 1999.

Bulger's "special relationship" with the FBI, and Connolly in particular, was reported by the *Boston Globe* as early as September 20, 1988, and cited as a possible reason why Bulger proved so elusive to law enforcement. Two *Boston Globe* articles on August 12, 1990 and November 11, 1990 reported on the perception of many in law enforcement that the FBI was somehow protecting Bulger from prosecution. The November article specifically mentioned the FBI's controversial purchase of liquor from Bulger's South Boston Liquor Mart, the store formally owned by Rakes and Dammers. As repeatedly reported by the *Boston Globe*, however, these suspicions of impropriety were met with vehement denials by the Boston office of the FBI. Rumors of the FBI's protection of Bulger swirled again among law-enforcement and prosecutors after indictments issued against Bulger and Flemmi, and were reported in the *Boston Globe* on March 5, 1995. But such talk was discounted in another *Boston Globe* article published on the same day, clarifying that no one had ever shown that the FBI was actively protecting Bulger and that such a view was "widely condemned as grossly unfair." During this period from 1988 to the mid-1990s, reports of the FBI's protection of Bulger did not rise above a general suspicion, and therefore the Court concludes that a reasonable person would not have cause during this time to believe that the FBI had a special relationship with Bulger and Flemmi that protected and encouraged them in their criminal activity, including the extortion of Rakes and Dammers. The facts available in the press during this period are even too thin to conclude that a reasonable person would have been provoked to inquire further. Nevertheless, the connections made in the press between Bulger, Connolly, and the FBI, and Bulger's uncanny knack of staying one step

---

need not reach the issue of whether Rakes

had actual knowledge.

ahead of the law, set the stage for the revelations to come.

From the summer of 1997 to the fall of 1998, Boston newspapers described in detail the FBI's protection of Bulger and Flemmi from prosecution and investigation. Given that many of the articles specifically discussed the 1984 extortion of Rakes and Dammers's liquor store and Rakes's subsequent perjury trial, at least some of them should have garnered attention from Rakes and Dammers.

The *Boston Globe* reported on June 26, 1997 that Flemmi had asserted in the *Salemme* proceedings that Morris gave him and Bulger assurances that they could continue to commit crimes without risk of prosecution in exchange for information about organized crime activities. Flemmi's affidavit, quoted in the June 26 article, stated that "Mr. Morris told Mr. Bulger and I that we could do anything we wanted so long as we didn't 'clip anyone.' On several occasions, . . . Mr. Bulger and I were assured that we could be involved in any criminal activities short of committing murder and we would be 'protected.' I operated and relied upon this express agreement with the FBI." Although the article reported that Flemmi's affidavit was contradicted by a Justice Department affidavit, the article also reported that Flemmi's affidavit was supported by a January 1995 report by the chief division counsel of the Boston office of the FBI concluding that Flemmi's handlers tacitly authorized his illegal gambling activities and involvement in La Cosa Nostra policy-making.

On January 7, 1998, the *Boston Herald* reported on the opening statements in the *Salemme* proceedings and Flemmi's claim that the FBI gave him and Bulger immunity from prosecution for crimes, including murder, in return for their work as informants. Two days later, on January 9, 1998, the *Boston Globe* published a story

stating that "[t]he FBI had looked the other way ... when it came to their prized informants" Bulger and Flemmi. The article reported that Bulger and Flemmi were "so shielded" by the FBI that the head of the FBI's Boston office, James W. Greenleaf, testified that he was unaware that Bulger and Flemmi had refused to take lie detector tests in connection with the murders of Roger Wheeler and his associate, that he was never told that the two were implicated in gambling, loansharking, drug dealing and extortion, and that the FBI never initiated an investigation of Bulger and Flemmi while he was in charge of the Boston office from 1982 to 1986.

In the summer of 1998, two articles published in the *Boston Globe* suggested a connection between the FBI's protection of Bulger and Flemmi from prosecution and investigation and Bulger and Flemmi's extortion of Rakes and Dammers. On June 25, 1998, in an article reporting on Stephen Rakes's perjury conviction, the *Boston Globe* reiterated Flemmi's contention that he was granted immunity from prosecution and discussed detective Lundbohm's unheeded report to Connolly regarding Bulger and Flemmi's extortion of the Rakes family liquor store. The following month, in an article published on July 22, 1998, the *Boston Globe* reported that the FBI had made Bulger and Flemmi into "sanctioned career criminals ... spying on the underworld for the FBI." The article, which specifically mentioned the extortion of Rakes and Dammers and Connolly's failure to report it to his supervisors, stated that "[d]espite solid evidence indicating Bulger and Flemmi were involved in murders, shakedowns, and drug dealing, the FBI looked the other way throughout the 1970s and 1980s." The article also reported that Morris had admitted in the *Salemme* proceedings to protecting Bulger and Flemmi, to leaking information to Bul-

ger and Flemmi about pending investigations, and to accepting bribes from Bulger and Flemmi. Morris's testimony also implicated Connolly, who, according to the article, had refused to testify in the hearings, citing his Fifth Amendment right not to incriminate himself.

Through the fall of 1998, the Boston press continued to draw a connection between the FBI's special relationship with Bulger and Flemmi and the extortion of Rakes and Dammers. The *Boston Herald* ran an article on September 23, 1998 summarizing the testimony of Supervisory Special Agent of the Boston Office James A. Ring in the *Salemme* proceedings. The article reported that Ring had testified that Connolly was "clearly out of line" when he failed to pass on information regarding Bulger and Flemmi's 1984 extortion of Rakes and Dammers's liquor store. Ring was quoted as testifying "I would have definitely expected (Connolly) to come to me and discuss it ... He didn't have the authority to handle that on his own." In another article specifically mentioning the extortion of Rakes and Dammers's liquor store and Lundbohm's meeting with Connolly, the *Boston Globe* reported on September 30, 1998 that Flemmi's defense lawyers were arguing that Flemmi and Bulger were "protected by their bureau handlers, who violated the agency's own guidelines." The article summarized the testimony of a former FBI supervisor who pointed out a "Catch-22" in the FBI's handling of informants, namely that the guidelines require the FBI to notify other agencies in certain circumstances when their informants have committed crimes but also require that the FBI keep their informant's identities confidential.

Based on the Boston press coverage from the summer of 1997 to the fall of 1998, the Court rules that the information contained therein was sufficient to establish that the FBI had a special relationship with Bulger and Flemmi that protected and encouraged them in their criminal activity, including the extortion of Rakes and Dammers. *See McIntyre*, 367 F.3d at 58–60 (holding based on similar news coverage that the Wheelers should have had notice "that the FBI had a special relationship with Bulger and Flemmi that protected and encouraged them in their criminal activity including Wheeler's murder").

Rakes and Dammers have argued that reports of the FBI's protection of Bulger and Flemmi from prosecution were contradicted in the local press during this same period, and therefore, the information contained therein was not sufficient to establish their first theory of liability. For example, on December 5, 1997, the *Boston Herald* reported that the FBI's Office of Professional Responsibility found "no evidence of continuing criminal conduct within the statute of limitations" by Morris or Connolly. Ranalli, *Justice Dept. Clears Ex–FBI Agents In Mob Case*, at 24 (internal quotations omitted). On January 9, 1998, the *Boston Globe* stated that FBI agents Greenleaf and Sarhatt had testified that Bulger and Flemmi were not given permission to commit crimes, Nealon, *FBI Loyalty To Mob Duo Is Detailed: DEA, Others Kept In Dark About Bulger, Flemmi Ties*, at B1, and the *Boston Herald* reported five days later that FBI agent Rico also testified that he did not promise to protect Flemmi from prosecution, Weber, *Flemmi's Lawyer Contends Fed Let His Crimes Slide*, at 10. Rakes and Dammers's argument is well-taken, but falls short. The same denials by the FBI did not preclude the First Circuit from holding in *McIntyre* that local news coverage in Boston and Tulsa contained sufficient facts to allow a reasonable person to infer a connection between the FBI's conduct and the murder of Roger Wheeler. *See McIntyre*, 367 F.3d at 59–61; *see also id.* at 61

(holding for purposes of equitable tolling that the government's denials of a "special" relationship between the FBI and Bulger and Flemmi and of any impropriety between them "were superseded when Morris testified in April 1998 in the *Salemme* hearings that he and Connolly shielded Bulger and Flemmi from prosecution and that they may have been responsible for Halloran's death").

The next question is whether Rakes and Dammers, "in their different positions, could reasonably be expected to be aware of this information." *Id.* at 59.[11]

Stephen Rakes, a native of South Boston, has stated in an affidavit that he did not know that the FBI was implicated as a contributing cause of the extortion until his lawyer told him about Judge Wolf's *Salemme* opinion in September or October of 1999. He states that he did not know about the *Salemme* proceedings, did not attend the hearings, and did not recall reading any of the press coverage in the record before May 11, 1999. Nonetheless, "where events receive . . . widespread publicity, plaintiffs may be charged with knowledge of their occurrence." *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir.1980) (cited with approval in *McIntyre*, 367 F.3d at 60). For example, even though Pamela Wheeler did not read any of the local press coverage of her father's murder, the First Circuit held that "[a] reasonable person in Pamela's situation would have been provoked to inquire further; had she done so, she would have filed a claim earlier." *McIntyre*, 367 F.3d at 60–61. The news coverage in Boston of the *Salemme* proceedings was extensive and often mentioned Stephen Rakes by name. There is nothing before this Court that would suggest that Rakes did not have access to the *Boston Globe* and the *Boston Herald* during the relevant time

period. Therefore, guided by *McIntyre*, this Court rules that Rakes had a duty to inquire based on local news coverage, and had he inquired further, he could have learned prior to May 11, 1999 the necessary facts underlying the first theory of his claim through that coverage.

Julie Dammers, also a native of South Boston, has stated that she did not know of a connection between the FBI and the extortion of her store before Judge Wolf's factual findings in the *Salemme* opinion. Dammers also asserts that she did not read the news articles in the record. Given the extensiveness of the local news coverage, the fact that many of the articles specifically mentioned the Rakes family and the extortion, and Dammers's access to the *Boston Globe* and the *Boston Herald,* this Court rules that Dammers, like her former husband, had a duty to inquire based on local news coverage, and had she inquired further, she could have learned prior to May 11, 1999 the critical facts underlying her first theory of liability.

■ The Court next turns to Rakes and Dammers's second theory of liability, namely that the FBI caused the extortion by leaking to Bulger information regarding the complaint made by Rakes and Dammers to Lundbohm. Rakes and Dammers argue that this theory is analogous to the theory of liability in the *McIntyre* case, *see McIntyre*, 367 F.3d at 54, and thus dependent on the following five facts: (1) Rakes and Dammers reported the extortion by Bulger and Flemmi to the FBI, which imposed a duty on the FBI; (2) Rakes and Dammers were extorted; (3) Bulger and Flemmi were responsible for the extortion; (4) Rakes and Dammers were extorted because Bulger learned of their complaint; and (5) It was agents of the FBI, Connolly,

---

**11.** The parties do not appear to dispute that Rakes and Dammers's knowledge of their in-

jury and its cause should be imputed to their children, Nichole, Meredith, and Colby.

or Morris, who told Bulger that Rakes and Dammers had reported the extortion. Rakes and Dammers's argument that the five basic facts outlined in the *McIntyre* case apply to this case is not entirely persuasive. In that case, the allegations were that the FBI leaked the identity of a confidential informant to Bulger and Flemmi, thereby enabling the two to murder him. For this reason, point four is especially awkward when adapted to this case given that most, if not all, of the extortionate conduct alleged here took place *prior* to the FBI's leak of information to Bulger. In the end, this ill fit seems to come to nothing because Rakes and Dammers do not appear to dispute that they had or should have had knowledge of the first four sets of facts. Instead, they focus on point five, arguing that sufficient facts were not available for a reasonable person to believe that it was agents of the FBI, Connolly, or Morris, who told Bulger that Rakes and Dammers had reported the extortion.

Rakes and Dammers argue that sufficient facts were not available prior to Judge Wolf's factual findings in *Salemme* to cause a reasonable person to believe that the FBI leaked Rakes and Dammers's extortion complaint to Bulger. In *Salemme*, Judge Wolf cited only the testimony of Lundbohm and Ring when making the following findings related to the Rakes and Dammers extortion:

> The Rakes sought Lundbohm's assistance, telling him what occurred. [Lundbohm Sept. 29, 1998 Tr.] at 116. Lundbohm knew that Bulger and Flemmi were reputed to be dangerous members of organized crime. *Id.* at 138. He felt that the FBI would be the most appropriate law enforcement agency to investigate the ongoing extortion. *Id.* at 134. He did not know that Bulger and Flemmi were FBI informants, or that Connolly was their handler. *Id.* at 123, 145.

> Lundbohm was acquainted with Connolly professionally, knew that he was involved in investigating organized crime and, with the Rakes' consent, decided to speak with Connolly in an effort to prompt an FBI investigation. *Id.* at 118. Lundbohm related to Connolly what the Rakes had told him. *Id.* at 119. Connolly asked whether the Rakes would "wear a wire" to record conversations with Bulger, Flemmi, and Weeks. *Id.* at 119, 126. Lundbohm indicated that he would advise them not to do so. *Id.* Connolly responded that he would take the information, but did not feel that there was much that the FBI could do. *Id.*

> Connolly made no record of the information Lundbohm had provided to him. Nor did he disclose it to Ring, who had become the Acting Supervisor of the Organized Crime squad in January 1983. Ring June 4, 1998 Tr. at 44. Connolly did, however, tell Bulger of his conversation with Lundbohm. Bulger subsequently urged the Rakes to "back off." Lundbohm Sept. 29, 1998 Tr. at 122. Lundbohm correctly inferred that Bulger had learned that the Rakes had been trying to generate an FBI investigation of him. *Id.* at 122, 139–40.

*Salemme*, 91 F.Supp.2d at 215–16. The citations in the opinion suggest that Judge Wolf relied generally on the testimony of Lundbohm in concluding that Connolly told Bulger about his conversation with Lundbohm.

The substance of both Lundbohm's and Ring's testimonies was reported in the local newspapers long before the issuance of *Salemme* on September 15, 1999, and more importantly, before the May 11, 1999 accrual date in this case. On May 28, 1998, the *Boston Globe*, citing *Globe* interviews and grand jury testimony read in court, reported in detail the extortion of

Rakes and Dammers's store, their complaint to Lundbohm, and Lundbohm's report of the extortion to Connolly. According to the article, Lundbohm said that he knew Connolly from various cases he had worked on and had arranged to meet with Connolly. Connolly admitted in an interview with the *Boston Globe* that he remembered being told that the Rakes family was threatened into selling their store, but that "they did not want to get wired up and they did not want to be witnesses." On June 17, 1998, the *Boston Herald* reported that according to Lundbohm's testimony, after Lundbohm had spoken with Connolly about the extortion, Stephen Rakes told Lundbohm that "Whitey said to back off." The article stated that "Lundbohm said he understood that to mean that 'Bulger had some knowledge of the conversation with Mr. Connolly.'" It also reported that Lundbohm had testified that the only other person who knew about his conversation with Connolly was former Boston Police Superintendent Anthony DiNatale.

Although Connolly denied leaking information to Bulger about Rakes and Dammers's complaint in both the *Boston Globe* and the *Boston Herald* on June 17, 1998, an article published by the *Boston Globe* on July 22, 1998 reported that Lundbohm had said that he believed that Connolly had tipped Bulger about their meeting. Connolly again denied leaking the information, but the article reported that "federal prosecutors said a search of FBI files failed to uncover any paperwork on [the incident]." The article concluded that "[i]t appears Connolly made a unilateral decision to neither investigate the extortion nor pass it along to a supervisor." This conclusion was supported by Ring's testimony, as summarized in the *Boston Herald* on September 23, 1998.

The press coverage during the summer and fall of 1998, like the testimony of Lundbohm and Ring before Judge Wolf in the *Salemme* proceedings, contained only circumstantial evidence that the FBI leaked Rakes and Dammers's complaint to Bulger. The pool of suspects essentially contained three individuals: Connolly, Lundbohm, and DiNatale. Connolly, for his part, denied talking to Bulger about the extortion. Given the press coverage of Morris's testimony in the *Salemme* proceedings regarding his and Connolly's protection of Bulger, one could reasonably conclude that Connolly's word on this matter would not be worth much. Furthermore, according to Ring's testimony, Connolly acted inappropriately and beyond his authority when he failed to report or act on Rakes and Dammers's extortion claims. Lundbohm, who fingered Connolly for the leak, could also have been lying. The *Boston Herald* reported on June 3, 1998 that Lundbohm was convicted in 1990 for taking bribes to protect gambling activities in South Boston and the North End. Moreover, Rakes states in his affidavit that he did not know who leaked the information, but he personally suspected Lundbohm. As for DiNatale, nothing in the press coverage contained in the record suggests that any witness or news source seriously considered him the source of the leak.

For the same reasons discussed above in relation to their first theory of liability, the Court rules that Rakes and Dammers, in their different situations, could reasonably be expected to be aware of the information contained in the local press, even though they claim not to have read these particular articles. Based on the local press coverage of the extortion of Rakes and Dammers during 1998, reasonable persons in Rakes and Dammers's positions would, at a minimum, *suspect* that Connolly tipped Bulger to his meeting with Lundbohm, and this suspicion would thus trigger a *duty to inquire. See McIntyre*, 367 F.3d at 55. This is not to say that Connolly was more

of a suspect than Lundbohm. Rather, persons in Rakes and Dammers's positions would reasonably suspect Connolly of the leak as well.

Rakes and Dammers have argued that the FBI's denials of wrongdoing made it unreasonable for persons in their positions to suspect that the FBI was the source of the leak to Bulger. Although the First Circuit did conclude in the McIntyre wrongful death case that the FBI's denials "further undercut [ ] [the government's] argument that there were sufficient facts before May 25, 1998 to reasonably infer that [the] FBI had betrayed McIntyre," McIntyre, 367 F.3d at 56, the circumstances there are distinguishable from the instant case. In the McIntyre case, the First Circuit observed that there was nothing in the press to connect the FBI to the leak of McIntyre's identity. See id. at 55–57. Conversely, in this case there was newspaper coverage to suggest that Connolly was indeed the source of the leak. Therefore, this Court dismisses Rakes and Dammers's contention that Connolly's denials in the press save their claims.

Neither Rakes nor Dammers inquired as to who was the source of the leak to Bulger. Had they done so, they would be privy, prior to the accrual date of May 11, 1999, to the testimony of Lundbohm and Ring, as summarized in the local press. The testimony of these two witnesses appeared to be enough for Judge Wolf to believe that Connolly had indeed been the source of the leak. See Salemme, 91 F.Supp.2d at 215–16 (citing only the testimony of Lundbohm and Ring in support of his findings regarding the extortion). Beyond this testimony, Rakes and Dammers also could have deposed Connolly, Lundbohm, and DiNatale. See Fed.R.Civ.P. 27(a) (allowing for depositions before the filing of an action). It is unlikely that their attempts to gain information about the leak through depositions would "have been thwarted by invocations of the Fifth Amendment privilege against self-incrimination," as in the McIntyre wrongful death case. McIntyre, 367 F.3d at 55–56. This is because the statute of limitations on Rakes and Dammers's extortion in 1984 had already run by the time the duty to inquire triggered in 1998. See 18 U.S.C. § 3282(a); Mass. Gen, Laws ch. 277, § 63. There is no statute of limitations, by contrast, on McIntyre's murder. See 18 U.S.C. § 3281; Mass. Gen. Laws ch. 277, § 63. Accordingly, the Court concludes that a reasonably diligent investigation would have revealed the necessary factual predicate for Rakes and Dammers's second theory of liability before the accrual date.

■ Finally, the Court turns to Rakes and Dammers's third theory of liability, namely that the FBI caused the extortion of Rakes and Dammers's liquor store by failing to ensure that Connolly and Morris followed FBI Guidelines in their handling of Bulger and Flemmi. This third theory builds on Rakes and Dammers's first theory that the FBI protected Bulger and Flemmi from prosecution, which emboldened them to commit crimes, including the extortion. Throughout 1998, local newspapers reported allegations that the conduct of Bulger and Flemmi's handlers violated FBI guidelines, and described FBI supervisors as easily swayed by Connolly's assurances or as simply out of the loop. At least some of these articles should have caught Rakes and Dammers's attention since they discuss the extortion of their liquor store.

In a September 30, 1998 article that specifically mentioned the extortion of Rakes and Dammers and Lundbohm's conversation with Connolly, the Boston Globe reported that Flemmi's defense lawyers were arguing that Flemmi and Bulger were "protected by their bureau handlers,

who violated the agency's own guidelines." The *Boston Globe* reported on January 9, 1998 that Bulger and Flemmi were "so shielded" by the FBI that supervisor Greenleaf, testified that he was unaware that Bulger and Flemmi had refused to take polygraph tests in connection with the murders of Roger Wheeler and his associate, that he was never told that the two were implicated in gambling, loansharking, drug dealing, and extortion, and that the FBI never initiated an investigation of Bulger and Flemmi while he was heading up the Boston office from 1982 to 1986. On July 22, 1998, the *Boston Globe*, citing testimony from the *Salemme* proceedings and specifically mentioning the extortion of Rakes and Dammers, reported that "[a]lthough there is evidence that Connolly protected Bulger and Flemmi, he was not alone. Supervisors and fellow agents often were swayed by his claim there was insufficient evidence to target the pair or that they were too valuable to the FBI." Two months later, the *Boston Herald* published an article on September 23, 1998 summarizing the testimony of supervisor Ring regarding the extortion of Rakes and Dammers's store. According to the article, Ring had testified that Connolly was out of line when he failed to pass on information regarding Bulger and Flemmi's extortion of Rakes and Dammers, and he was quoted as testifying that he "would have definitely expected (Connolly) to come to [him] and discuss it ... He didn't have the authority to handle that on his own."

This local newspaper coverage, when combined with the previously-discussed press coverage of the FBI's protection of Bulger and Flemmi, contains sufficient information to cause a reasonable person to believe, before May 11, 1999, that the FBI failed to ensure that Connolly and Morris followed FBI guidelines in their handling of Bulger and Flemmi. At a minimum, these articles trigger a *duty to inquire*.

Had Rakes and Dammers performed a reasonably diligent inquiry, they would have been able to find out through depositions and other research that Connolly likely violated guidelines by not reporting Rakes and Dammers's complaint and that the FBI supervisors kept Connolly and Morris on negligently long leashes. There was enough in the press to know that guidelines existed and that Connolly and Morris's conduct probably violated them.

The Court, therefore, also rules, for the same reasons discussed previously in this opinion, that Rakes and Dammers, in their different situations, could reasonably be expected to be aware of this information, even though they claim not to have read these articles.

### D.  Duress, Fraudulent Concealment, and Equitable Tolling

■ Rakes and Dammers's argument that the statute of limitations should be tolled under the doctrine of duress is unpersuasive. Duress must be shown by specific factual examples of the defendant's "coercive acts of threats." *Pahlavi v. Palandjian*, 809 F.2d 938, 942–43 (1st Cir. 1987). In spite of Rakes and Dammers's suffering at the hands of both the Gang and FBI agents who covered up the Gang's illegal conduct, tolling the statute of limitations as a result of their duress would be unprecedented in a case like this. Duress tolls the statute of limitations in rare cases. *Id.* at 942. Rakes and Dammers have not cited any analogous cases involving the FTCA or a suit against the government that would sustain their assertions that their duress would toll the statute here. Although Rakes and Dammers allegedly received threats from the Gang, they offer no facts upon which this Court can reasonably infer that the United States used coercive acts of threats against them. Also, Dammers's courage to file a state suit against numerous Gang mem-

bers in 2001 and to testify before a federal grand jury in Rakes's case numbs her duress claim. Duress thus cannot toll the statute of limitations in order to save Rakes and Dammers's FTCA claims.

■ Rakes and Dammers's claim of fraudulent concealment is likewise unavailing. Fraudulent concealment on the part of the defendant tolls the statute of limitations only when two elements are met: (1) the defendant, relying on the statute of limitations, acted to conceal facts related to its misconduct and (2) the plaintiff failed to discover the misconduct despite acting with due diligence. *Gonzalez v. United States*, 284 F.3d at 292. Since this Court has held that Rakes and Dammers *should have known* of sufficient facts underlying their theories of liability prior to May 11, 1999 under the objective accrual test of *McIntyre*, it follows that Rakes and Dammers fail to meet the second prong of the fraudulent concealment test because they were not acting with due diligence.

■ Finally, Rakes and Dammers claim of equitable tolling based on the FBI's numerous denials of wrongdoing fails for the same reasons expressed by the First Circuit in the *Wheeler* case:

> The claim of equitable tolling of the two-year limit fails, to the extent that such a claim is cognizable against the government at all. It is true that the FBI had a long history of denying that Bulger and Flemmi were informants, that there was any "special" relationship between the FBI and the two, and then that any

impropriety resulted from the relationship. For purposes of equitable tolling, however, the government's denials were superseded when Morris testified in April 1998 in the *Salemme* hearings that he and Connolly shielded Bulger and Flemmi from prosecution and that they may have been responsible for Halloran's death.

*McIntyre*, 367 F.3d at 61 (internal footnote omitted). Guided by the First Circuit's approach in *McIntyre*, this Court rules that Morris's 1998 testimony in the *Salemme* hearings undermined the FBI's previous denials of wrongdoing in relation to their handling of Bulger and Flemmi. Thus, Rakes and Dammers's claim of equitable tolling fails to the extent it is even available to them in an FTCA suit. *See id.* at 61 n. 8 (comparing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) (noting that equitable tolling applies to Title VII suits against the government), with *United States v. Beggerly*, 524 U.S. 38, 49–50, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998) (holding for reasons that could also apply to the FTCA that equitable tolling does not apply to suits under the Quiet Title Act, 28 U.S.C. § 2409a)).

## III. CONCLUSION

In *McIntyre*, the First Circuit applied a harsh and uncompromising objective test to a record of press disclosures identical in all relevant respects to that before this Court. This Court is constrained to follow the *McIntyre* analysis.[12] Accordingly, the

12. While the FTCA incorporates Massachusetts law, counsel appearing in the courts of the Commonwealth should neither cite *McIntyre* nor this decision as representing the Massachusetts approach to the "discovery rule" in statute of limitations litigation. This is because the Massachusetts courts themselves take a more generous, remedial view of the discovery rule, *see e.g. Riley v. Presnell*, 409 Mass. 239, 240, 244–46, 565 N.E.2d 780 (1991) ("A cause of action will accrue when

the plaintiff actually knows of the cause of action or when the plaintiff should have known of the cause of action.... Accrual of the cause of action occurs when the ordinary reasonable person who had been subject to the experience would have discovered that the injury was caused by that experience."); *Bowen v. Eli Lilly & Co., Inc.*, 408 Mass. 204, 208–09, 557 N.E.2d 739 (1990) ("We do not require that a plaintiff have notice of a breach of a duty before a cause of action may accrue,

United States' Renewed Motion to Dismiss the FTCA claims as time-barred [Doc. No. 179] is ALLOWED, and the United States' Motion for Summary Judgment on the FTCA claims [Doc. No. 195] is thus rendered MOOT.

SO ORDERED.

but we do require that a plaintiff have (1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was."); *Castillo v. Mass. Gen. Hosp.*, 38 Mass.App.Ct. 513, 516–17, 649 N.E.2d 788 (1995) (same); *Sawyer v. Indevus Pharms., Inc.*, No. 03–5028–B, 2004 WL 1739405, at *15 (Mass.Super. July 26, 2004) (Brassard, J.) (noting the crucial moment as "the first time there was *any indication* of injury conveyed to these plaintiffs."). This Court, however, is here constrained to apply the First Circuit view of Massachusetts law since *McIntyre* analyzes a record virtually identical to that presented here.